716 P.2d 1288

**STATE of Idaho, Plaintiff-Respondent,**

v.

**John L. JOHNSON, Defendant-Appellant.**

**No. 16106.**

Supreme Court of Idaho.

March 12, 1986.

**518**

Kent E. Whittington, Idaho Falls, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., and A. René Fitzpatrick, Deputy Atty. Gen. (argued), Boise, for plaintiff-respondent.

BISTLINE, Justice.

### HISTORY

On April 13, 1982, John Johnson was renting an apartment in Idaho Falls, Idaho. The record before us contains Johnson's affidavit, which states, among other things, that he was current in his rent and in all other ways in compliance with his rental agreement. Police officer Earl Sorensen, the officer who searched Johnson's apartment and seized the evidence that is the subject of Johnson's motion to suppress, signed an affidavit which stated that he was told by Joe Clevenger, Johnson's landlord, that Johnson was behind in his rent.

Sorensen stated in his affidavit that Clevenger entered Johnson's apartment on April 12, 1982, to see if Johnson had moved out. Clevenger observed what he thought were "suspicious plants," and called the police. Sorensen's affidavit states that he received an order to respond to a "suspicious call." When Sorensen arrived, Clevenger told him that he had observed "suspicious plants" and invited Sorensen inside to observe them. At Clevenger's invitation, Sorensen entered the apartment and, looking around, discovered the "suspicious plants." Sorensen testified at the motion to suppress hearing that, as he entered the apartment, he immediately noted several personal effects which clearly indicated to him that someone was residing therein. Nevertheless, Sorensen continued to enter the apartment and, when looking behind the front door, observed the "suspicious plants." Believing the plants to be marijuana, Sorensen left the apartment to obtain a warrant in order to seize the suspected contraband.

The affidavit Sorensen filed in support of the warrant he procured states the following:

1. Your Affiant received an Order to Respond to a suspicious call from Joe

Clevenger, landlord of the above address.

2. Mr. Clevenger indicated that the individual renting apartment #7 had been told to move due to non-payment of rent. He further indicated that last night, April 12th, 1982, he had entered the apartment to see if the renter had moved and observed suspicious plants growing in five gallon buckets.

3. On this day, April 13, 1982, your affiant was requested by Mr. Clevenger to enter the apartment and observe these plants and was let into the apartment by Mr. Clevenger and observed said plants.

4. Based upon your affiant's experience, he believes the plants to be marijuana and further believes that due to the large number of plants, additional useable material, paraphernalia and records will be located in said apartment.

Items 3 and 4 of the affidavit were based on the officer's personal observations while inside Johnson's home. Johnson argues that these two items should be excluded from the affidavit because they are "fruit" of the officer's unconstitutional entry into his home. Johnson's argument is predicated on the fact that he was unaware of and did not consent to the officer's entry into his home, and that his landlord was without such authority, for Fourth Amendment purposes, to consent to the officer's entry. Johnson concludes, therefore, that because the officer entered Johnson's home without a warrant, his entry and search were illegal. Thus, all evidence discovered and obtained as a result of that illegal search should have been suppressed.

The district court denied Johnson's motion to suppress. The district court thought it important to discover *how* the officer entered Johnson's home—whether it was in response to the landlord's invitation or whether in response to the officer's request. Said the court: "The question I want to know the answer to is who instigated the entry?" R., Vol. 1., p. 10. The

uncontradicted testimony revealed that the landlord invited the officer enter.

Without giving any reason at all, the district court denied Johnson's motion to suppress. Nevertheless, because the district court thought it important *how* the officer entered, the court must have reached its conclusion based upon the belief that Johnson's landlord could consent to the officer's search of Johnson's home. Johnson appealed, and his case was assigned to the Court of Appeals. A special panel of that court, comprised of Justice Robert C. Huntley, retired Justice Joseph McFadden, and retired District Judge James G. Towles, unanimously reversed the district court in an exhaustive opinion—which was in turn added to by an additional opinion on denial of the state's petition for rehearing. *State v. Johnson,* 108 Idaho 619, 701 P.2d 239 (Ct.App.1985). The state has now petitioned this Court for review.

## I. THE SEARCHES

As the Court of Appeals noted, there were three searches of Johnson's home: the first search by the landlord, the second search by the officer at the landlord's invitation but prior to the obtaining of a valid search warrant, and the third search by the officer after obtaining a warrant.

■ The first search by the landlord, although not consented to by Johnson, implicates no interests of the Fourth Amendment or art. 1, § 17 of the Idaho Constitution because those provisions only prohibit illegal *governmental* searches and seizures. *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *State v. Pontier,* 103 Idaho 91, 94, 645 P.2d 325, 328 (1982). It is the latter two searches to which we turn our attention. The second search raises issues involving whether the conduct of the police officer constituted a search for Fourth Amendment and art. 1, § 17 purposes, whether Johnson's landlord could adequately consent to a search of Johnson's home, and whether Johnson had a legitimate expectation of privacy that was violated in this case. The third search's validity depends to a large degree upon the validity of the

**520**

second search. It also independently raises issues involving the validity of the search warrant, what constitutes probable cause, and what constitutes tainted evidence that must be suppressed.

A. *The Second Search in This Case Implicates Rights Protected by the Fourth Amendment to the United States Constitution and Art. 1, § 17 of the Idaho Constitution.*

■■■■ The state begins by arguing that there is no issue of consent in this case because "the police viewing of the results of the private search was not a search within the confines of the Fourth Amend-

ment...." Respondent's Brief in Support of Petition for Rehearing, p. 9–10.[1] In the state's view, the officer's conduct was a "police viewing" of what Johnson's landlord had uncovered, and not a search. Respondent's Brief, *supra,* pp. 9–10. We reject the state's characterization, finding it to be factually and legally without merit.

The cases the state relies upon[2] do not support the state. Each of these cases involved a private individual *turning over the results of his or her private search to the government.* They do not, with the possible exception of *Lucas, supra,* and *Eisentrager, supra,*[3] involve a police offi-

---

1. Although unmentioned by the state, but raised as an issue by Johnson, art. 1, § 17 of the Idaho Constitution also prohibits unreasonable searches and seizures in wording that is very similar to that contained in the Fourth Amendment. Similar wording, however, does not necessarily demand similar interpretation. The reason for this is, as this Court unanimously declared in *State v. Newman,* 108 Idaho 5, 10 n. 6, 696 P.2d 856, 861 n. 6 (1985):

 [The] federal and state constitutions derive their power from independent sources. [Thus,] state courts are at liberty to find within the provisions of their own constitutions greater protection than is afforded under the federal constitution as interpreted by the United States Supreme Court. *See Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975). *This is true even when the constitutional provisions implicated contain similar phraseology.* Long gone are the days when state courts will blindly apply United States Supreme Court interpretation and methodology when in the process of interpreting their own constitutions. (Emphasis added.)

2. *Jacobsen, supra; Pontier, supra; United States v. Bulgier,* 618 F.2d 472 (7th Cir.1980); *United States v. McDaniel,* 574 F.2d 1224 (5th Cir.1978) *cert. denied,* 441 U.S. 952, 99 S.Ct. 2181, 60 L.Ed.2d 1057; *United States v. Haes,* 551 F.2d 767 (8th Cir.1977); *United States v. Blanton,* 479 F.2d 327 (5th Cir.1973); *Eisentrager v. Hocker,* 450 F.2d 490 (9th Cir.1971); *Clayton v. United States,* 413 F.2d 297 (9th Cir.1969) *cert. denied,* 399 U.S. 911, 90 S.Ct. 2204, 26 L.Ed.2d 565; *Gandy v. Watkins,* 237 F.Supp. 266 (D.C.Ala. 1964) *cert. denied,* 380 U.S. 946, 85 S.Ct. 1032, 13 L.Ed.2d 965; *Lucas v. State,* 381 So.2d 140 (Miss.1980); *State v. Morris,* 41 N.C.App. 164, 254 S.E.2d 241 (1979).

3. In *Lucas,* the police officer accompanied the private individual to the apartment that the individual had searched. While inside the apartment, the individual showed the police officer

stolen contraband he had discovered in the defendant's clothing. The police officer did not also search the apartment or personal effects of the defendant but simply looked at what the private individual had uncovered. Thus, it is readily apparent that the police officer, although inside the defendant's apartment, and without a warrant, conducted no independent search of his own but merely observed the fruits of the original private search. While we express no opinion as to the constitutional propriety of the government action in *Lucas,* we note the substantial and qualitative difference that exists between it and our case, wherein we *do* have *an independent* government search, inside the defendant's home, and at the invitation of the landlord.

As for *Eisentrager,* the Court of Appeals accurately distinguished the facts of this case from those found in *Eisentrager* in the following manner:

In *Eisentrager,* a landlady had reason to believe that her tenant had vacated his apartment. She entered the apartment and found the corpse of the tenant's wife hidden under a blanket in a closet. In *Eisentrager,* the court stated, *"the presence of the hidden corpse was the strongest possible evidence to lead her (the landlord) to believe that Eisentrager had abandoned the apartment...."* After finding the corpse the landlady called the police who entered the apartment. The *Eisentrager* court concluded that upon finding the corpse the landlady, as owner, had a right to take possession of the apartment, and to invite the police to enter and search. Thus, at the time the officers entered that apartment Eisentrager no longer had a reasonable expectation of privacy in it. The facts of the instant case, of course, are otherwise. At the time the officer entered Johnson's residence, Johnson clearly retained a legitimate expectation of privacy in it. *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19

cer following a private citizen into a home and conducting an independent search of that home. As the Court of Appeals noted:

> In the instant case ... the suspected contraband was *not* turned over to the authorities; instead the landlord *invited* the officer to enter a private dwelling to observe the contraband first-hand. In this case, the suspected contraband was *not* in plain view; *and the landlord had neither personally seized nor delivered it to the police.* The *officer* had to *enter* the private dwelling in order to see it. The fact that the Fourth Amendment does not reach the landlord does not mean that the officer, a government official, is also immune from its sanctions simply because he accompanied the landlord. *Johnson, supra,* 108 Idaho at 622, 701 P.2d at 242, n. 2 (emphasis to "officer" in original; remainder of emphasis added).

There simply is no evidence in this case from which Johnson's landlord could have concluded that Johnson had *abandoned* his apartment. *On the contrary, the record reveals that numerous personal effects were found in Johnson's home, suggesting, that, far from abandoning his home, he was still living there.*

The illogic of the state's argument that the officer's entry and search did not constitute a search for Fourth Amendment purposes is best observed by noting the results that would flow from application of its argument. If the state were to have its way on this point, it would apparently argue that the following scenario is outside constitutional protection: A private citizen ransacks a home, claiming to be in search of contraband. Upon discovering the alleged contraband, the citizen calls in the police who conduct a second ransacking of the home, looking and searching everywhere and inspecting everything as did the citizen. According to the state, because the officer is only "viewing" the citizen's efforts—"merely" retracing the citizen's footsteps—such government activity is outside the purview of federal and state constitutional protections. Such an abbera-

L.Ed.2d 576 (1967). *Johnson, supra,* 108 Ida-

tional view is not harmonious with what the framers of our federal and state constitutions intended when they put these protections into our constitutions, and we so hold.

It is of no avail for the state to claim that the police officer "unwittingly" entered the apartment or that his discovery was a "plain view" discovery of the evidence. His affidavit clearly states that Johnson's landlord informed him that there were "suspicious plants," which he (the police officer) should see. *Thus, the officer knew before entering Johnson's home that he was entering in to ascertain if some allegedly "suspicious plants" were, in fact, contraband.*

■ The officer also testified at the motion to suppress hearing, and at the preliminary hearing, that: "As I went into the apartment I observed several personal items that indicated someone still lived there." Nevertheless, the officer testified that he continued to enter Johnson's home—approximately five or six feet—to search for the "suspicious plants." Only after looking behind a door did the officer discover the alleged "suspicious plants." *Thus, it is clear that the evidence was not "exposed to the plain view" of the officer, and that he did not have "not only a right, but also a duty"* to be where he was. *State v. Ellis,* 99 Idaho 606, 608, 586 P.2d 1050, 1052 (1978) (emphasis added). *See also Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983) ("The question whether property in plain view of the police may be seized therefore must turn on the legality of the intrusion that enables them to perceive and physically seize the property in question."). Accordingly, any "plain view" argument must also fail.

■ The officer knew that the landlord requesting the search was just that, a landlord, and nothing more—certainly not a spouse or a co-tenant. The police officer is imputed with knowledge of the law, which, as we detail below, *see* part I.B.2. *infra,*

ho at 625, 701 P.2d at 245 (emphasis added).

includes among other things, the fact that (1) warrantless searches are *per se* unconstitutional, unless a specific exception to the rule exists, and (2) that a landlord's consent is insufficient to permit a government official to search the home of a renter/lessee. Thus, we have a *prima facie* case, *even as seen from the point of view of the officer,* where rights under the Fourth Amendment and art. 1, § 17 have been implicated. We turn now to the question of whether those rights were violated.

B. *Johnson's Landlord Did Not Have Proper Authority to Consent to the Police Officer's Search of Johnson's Home.*

1. *Introduction.*

■ It is axiomatic that warrantless searches are *per se* unreasonable, and therefore unconstitutional, unless a specifically enumerated exception to this rule applies. *State v. Bottelson,* 102 Idaho 90, 92, 625 P.2d 1093, 1095 (1981); *State v. Ellis,* 99 Idaho 606, 608, 586 P.2d 1050, 1052 (1978); *State v. Harwood,* 94 Idaho 615, 617, 495 P.2d 160, 162 (1972). Basically, there are three common exceptions to the warrant rule: (1) a search incident to a lawful arrest, *Harwood, supra,* at 618, 495 P.2d at 163; (2) a search in response to exigent circumstances,[4] *Id.,* and (3) a search conducted pursuant to properly given consent. *Id.*

There is no argument that any of these exceptions apply except the consent exception. Specifically, the state can only excuse the warrantless search in this case if it can persuade us that the landlord had proper authority to consent to the police officer's search. We hold that the landlord did not have such authority.

---

**4.** Courts have found various fact patterns as constituting exigent circumstances, and have accordingly waived the warrant requirement of the Fourth Amendment in these cases. *See, e.g., United States v. Perez,* 440 F.Supp. 272 (N.D. Ohio 1977), *aff'd* 571 F.2d 584 (6th Cir.), *cert. denied* 435 U.S. 998, 98 S.Ct. 1652, 56 L.Ed.2d 88 (1978) (upholding warrantless search for explosives); *Warden Maryland Penitentiary v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782

2. *The Landlord Did Not Have Authority to Consent to the Search of Johnson's Home.*

■ The burden of proving that consent has been given, and that the person giving the consent had authority to do so, is on the state. *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *State v. Post,* 98 Idaho 834, 837, 573 P.2d 153, 156 (1978), *overruled on other grounds, State v. Bottelson,* 102 Idaho 90, 625 P.2d 1093 (1981). It is conceded that Johnson's landlord consented to the search of Johnson's apartment. The issue, however, is whether he had authority to do so. The United States Supreme Court has supplied the test by which to determine whether a third party had authority to consent to a search by a government official:

[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed *common authority* over or other sufficient relationship to the premises or effects sought to be inspected.[7]

---

7. Common authority is, of course, not to be implied from the mere property interest a third party has in the property. *The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements,* see *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (night hotel clerk could not validly consent to search of customer's room) *but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed*

(1967) (search with a probable cause for and in hot pursuit of a fleeing and dangerous felony suspect is proper); *United States v. Barone,* 330 F.2d 543 (2d Cir.1964) *cert. denied* 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (search based upon apparent medical emergency is valid); *State v. McCleary,* 116 Ariz. 244, 568 P.2d 1142, 1143 (1977) (warrantless search for bound and gagged robbery victims is proper).

*the risk that one of their number might permit the common area to be searched. Matlock, supra, 415 U.S. at 171, 94 S.Ct. at 993 (emphasis added).*

Thus, our inquiry is, in the words of the United States Supreme Court, whether the state has proven that Johnson's landlord had "mutual use of the property," and whether Johnson "assumed the risk that [Johnson's landlord] might permit the common area to be searched." [5]

A person's home "is accorded the full range of Fourth Amendment protections." *Lewis v. United States*, 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966). *Moreover, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed...." United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972) (emphasis added). *See also State v. Louis*, 296 Or. 57, 672 P.2d 708, 710 (1983) (The defendant's "living quarters ... are the quintessential domain protected by the constitutional guarantee against warrantless searches."); *accord, State v. Martin*, 139 Ariz. 466, 679 P.2d 489, 496 (1984). Our constitutions make no distinction between owned and rented living quarters. So long as a tenant has not abandoned the premises, protection of the Fourth Amendment and art. 1, § 17 is not lost. *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960).

Applying the test announced in *Matlock, supra*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7, to the facts of this case, and for the reasons set forth below, we hold that Johnson's landlord was without authority for purposes of either the Fourth Amendment or art. 1, § 17 to give effective consent to a search of Johnson's home.

The reason for our holding in this case is that the state was unable to present any evidence that Johnson's landlord had "mutual use of the property" or that Johnson "assumed the risk that [Johnson's landlord] might permit the common area to be searched." *Matlock, supra*, 415 U.S. at 171, n. 7, 94 S.Ct. at 993, n. 7. Furthermore, the evidence in this case reveals that Johnson had a legitimate and reasonable expectation of privacy in his home. There is no evidence that he had abandoned his residence. There is evidence that he still was residing there. This was given in the form of the testimony of the police officer who performed the offending search.[6]

Whether the rental period had expired is a factual issue that has not yet been decided. That issue need not be decided in the context of this case, however, because we hold that Johnson was entirely justified in expecting his landlord to resort to the eviction procedures required by law rather than resorting to self-help in seeking rent payment if he was in fact behind in his rent. *United States v. Botelho*, 360 F.Supp. 620, 624–25 (D.Hawaii 1973); *United States v. Olsen*, 245 F.Supp. 641, 644–45 (D.Mont.1965); *State v. Taggart*, 7 Or.App. 479, 491 P.2d 1187, 1189 (1971).[7]

Our holding is consistent with what other courts have held in similar situations. For

---

5. The reason these questions are important is that the Fourth Amendment and art. 1, § 17 are designed to protect a person's legitimate expectation of privacy, which "society is prepared to recognize as 'reasonable.'" *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978), quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); *accord, Bottelson, supra*, 102 Idaho at 92, 625 P.2d at 1095.

6. Additional evidence of Johnson's expectation of privacy is readily inferred by the fact that the marijuana plants were not hidden or concealed, but openly situated in pots around the room.

7. I.C. § 6–303(2) requires that a landlord *notify in writing* an individual who is behind in his or her rent *before* the injured landlord can resort to an action for possession, I.C. § 6–310, or damages, I.C. § 6–311E. Until written notice is given, however, the non-paying tenant is *not* viewed by the law as unlawfully detaining the rented premises. I.C. § 6–303(2).

There is nothing in this record to suggest that Johnson was unlawfully detaining the searched premises—the requirements enumerated above have not been followed by the landlord. Our record reveals no evidence that Johnson's landlord ever gave Johnson written notice of nonpayment of rent as spelled out by I.C. §§ 6–303(2) and 6–304. Therefore, the record we have reveals that Johnson's occupancy of the rented premises was legal. He therefore was justified in expecting protection from the subsequent government intrusion and search.

example, as the Court of Appeals noted, a lessor/landlord *cannot* give effective consent to a search of a rental house, *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), an apartment, *People v. Boorem*, 184 Colo. 233, 519 P.2d 939 (1974), a room in a rooming house, *State v. Warfield*, 184 Wis. 56, 198 N.W. 854 (1924), a hotel, *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), or even a locker, *Murdock v. State*, 664 P.2d 589 (Alaska App.1983).

### 3. *Conclusion.*

We therefore hold the following: (1) that the second search by the police officer at the invitation of Johnson's landlord was a search for purposes of the Fourth Amendment; (2) that Johnson had a legitimate and reasonable expectation of privacy in his home; (3) that applying the United States Supreme Court test found in *Matlock, supra*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7, the landlord did not have authority to consent to the search of Johnson's home; and (4) that the police officer, not having consent to conduct the search, and there being no other exception applicable to our constitutions' warrant requirements, conducted an unreasonable and, therefore, unconstitutional search. Thus, we turn to the issue of what remedy is necessary to correct the unconstitutional search conducted here.

## II. THE EXCLUSIONARY RULE APPLIED TO THE FACTS OF THIS CASE

### A. *Introduction.*

#### 1. *Federal Law.*

■ The exclusionary rule states that evidence obtained as a result of an illegal search or seizure is inadmissible in the criminal trial of a defendant. *Weeks v. United States*, 232 U.S. 383, 394–98, 34 S.Ct. 341, 345–46, 58 L.Ed. 652 (1914); *Gouled v. United States*, 255 U.S. 298, 306–07, 41 S.Ct. 261, 264, 65 L.Ed. 647 (1921).[8] The rule is a "judicially created means of effectuating the rights secured by the Fourth Amendment." *Stone v. Powell*, 428 U.S. 465, 482, 96 S.Ct. 3037, 3047, 49 L.Ed.2d 1067 (1976).

The rule was first established by the United States Supreme Court in *Weeks, supra*, and *Gouled, supra*. In *Wolf v. Colorado*, 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361–62, 93 L.Ed. 1782 (1949), the Supreme Court held that the rights protected by the Fourth Amendment are enforceable against the states through the due process clause of the Fourteenth Amendment. The Court explicitly held, however, that the *Weeks-Gouled* exclusionary rule would not be imposed upon the states. *Wolf, supra*, 338 U.S. at 29, 69 S.Ct. at 1362. Twelve years later, the Court changed its mind, holding that the exclusionary rule is applicable to the states. *Mapp v. Ohio*, 367 U.S. 643, 654–56, 81 S.Ct. 1684, 1691–92, 6 L.Ed.2d 1081 (1961).

The *Mapp* majority justified the application of the rule to the states on several grounds. First, the rule would prevent the use of evidence which was "tantamount" to a coerced confession. *Id.* at 656, 81 S.Ct. at 1692. Second, the rule would serve as a deterrent to Fourth Amendment violations. *Id.* at 658, 81 S.Ct. at 1693. Third, the rule would protect judicial integrity. *Id.* at 659, 81 S.Ct. at 1693–94. Subsequent decisions of the Court have clarified the reason for the rule, stating that its primary purpose is that of deterrence. *Stone, supra*, 428 U.S. at 486, 96 S.Ct. at 3048–49.[9]

**8.** In 1922, this Court approved of the *Weeks* doctrine in *State v. Myers*, 36 Idaho 396, 413, 211 P. 440 (1922).

**9.** The Supreme Court, in establishing the exclusionary rule in *Weeks, supra*, succinctly described the purpose of the rule as follows:

If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment, declaring his right to

be secure against such searches and seizures, is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. *The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land. Weeks, su-*

Since *Mapp, supra,* the efficacy of the exclusionary rule has come under attack. *See Stone, supra,* 428 U.S. at 487–92, 96 S.Ct at 3049–51 and sources cited therein. In fact, in *Stone,* although holding that the rule was still applicable at trial and on direct appeal in criminal actions, the United States Supreme Court held that the rule is not applicable in federal *habeas corpus* proceedings where the state has provided the criminal defendant an opportunity for full and fair litigation of his or her Fourth Amendment claim. *Id.* at 494,[10] 96 S.Ct. at 3052.

### 2. *State Law.*

 Because of the holding in *Mapp, supra,* the exclusionary rule as defined by the United States Supreme Court is applicable to Idaho. As stated in *Newman, supra,* however, that does not mean that this Court will not afford appropriate protections under the Constitution of Idaho. *Newman, supra,* 108 Idaho at 10, n. 6, 696 P.2d at 861, n. 6. Indeed, this Court recognized the validity of and necessity for the

exclusionary rule long before the United States Supreme Court required states to apply it in state court proceedings. *State v. Arrequi,* 44 Idaho 43, 49–57, 254 P. 788, 789–92 (1927). In *State v. Conner,* 59 Idaho 695, 703, 89 P.2d 197, 201 (1939), this Court could already state:

> The rule is *well settled* in this state that evidence, procured in violation of defendant's constitutional immunity from search and seizure, is inadmissible and will be excluded if request for its suppression be timely made. ... (*State v. Arrequi,* 44 Ida. 43, 254 Pac. 788; 52 A.L.R. 463; *State v. Wansgaard,* 46 Ida. 20, 265 Pac. 671; *State v. Severns,* 57 Ida. 246, 273 Pac. 940 (emphasis added).[11]

Thus, from as early as 1927, this Court has held that a violation of an individual's constitutional rights against unreasonable searches will result in the exclusion of illegally seized evidence.

Cases subsequent to *Arrequi* have not treated the exclusionary rule in a niggardly way. For example, in *State v. Rauch,* 99 Idaho 586, 592–93, 586 P.2d 671, 677–78 (1978), Justice Donaldson authored this

---

*pra,* 232 U.S. at 393, 34 S.Ct. at 344 (emphasis added).

**10.** Cases subsequent to *Stone, supra,* have continued to restrict applicability of the exclusionary rule. For example, in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 3419–20, 82 L.Ed.2d 677 (1984), the Court held that the exclusionary rule should not be applied so as to bar the use of evidence in the prosecution's case in chief obtained by an officer acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid.

In *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 3391, 82 L.Ed.2d 599 (1984), the Court held that a valid warrant was a means adequately distinguishable to purge evidence of any "taint" arising from an illegal entry and search.

The applicability of *Leon* and *Segura* to the facts of this case will be discussed below. *See* Part II.C., *infra.*

**11.** Justice Morgan of this Court eloquently articulated the basis upon which to establish the exclusionary rule in a 1918 dissent, which was cited to in *Conner.* Justice Morgan said in part:

> *In order that the total disregard, disclosed by this record, of these constitutional safeguards*

> *may be effectual, the court must become a party to it by receiving the results as proof. I decine to .do so, and hold that evidence procured by an illegal or unreasonable search, the purpose of which was to discover and seize it, is inadmissible if timely and proper objection be made to its introduction, because it was procured by an invasion of the rights guaranteed to all persons within this state by sec. 17, art. 1, of the Constitution, and to admit it, against a defendant in a criminal case over such an objection, would be a violation, by the court, of sec. 13 thereof.*

These sections are guardians of American liberty and justice which come to us from the same source and with like sacrifice as did those, equally but not more greatly prized, whereby we are guaranteed religious liberty, trial by jury, the right to bear arms, to peaceably assemble, free speech, liberty of the press, and many other constitutional safeguards, which, because they have been faithfully upheld by the courts, have accomplished more than has any other agency to make this government one which the peoples of the earth may profitably copy. *State v. Anderson,* 31 Idaho 514, 527, 174 P. 124, 129 (1918) (Morgan, J., dissenting) (emphasis added).

Court's opinion, applying the exclusionary rule to suppress evidence taken by police officers in violation of Idaho's "knock and announce" statute, which is contained at I.C. §§ 19–611 and 19–4409.

In *State v. LePage*, 102 Idaho 387, 391–92, 630 P.2d 674, 678–79 (1981) *cert. denied*, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595, this Court declared that although the primary purpose of the exclusionary rule is to deter police misconduct, additional reasons for its use exist. Said the Court:

> Finally, we are cognizant of the need to insure that the judiciary does function, and is perceived as functioning, in a manner consistent with the individual constitutional rights, both state and federal, of all who appear before the bar of justice. While the primary purpose of the exclusionary rule is undoubtedly to deter police misconduct, *it is also true that at some point the courts must simply refuse to countenance certain behavior on the part of law enforcement agencies. "Courts ... cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered use of the fruits of such invasions." Terry v. Ohio*, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968). While "the imperative of judicial integrity," *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960), may not be the primary reason for refusing to allow the use of unconstitutionally seized evidence at trial, it certainly requires us to exercise our discretion to review alleged errors that affect substantial rights and are "plain" in the sense that it is evident that a mistake has occurred. (Emphasis added.)

B. *Application of the Exclusionary Rule Requires Suppression of the Evidence Obtained in This Case.*

 Because we have held that the search by Officer Sorensen at the invitation

of Johnson's landlord was unreasonable, and therefore unconstitutional, we also hold that the evidence gained as a result of the search must be excluded. In this case, the items of evidence obtained were personal observations by Officer Sorensen, who used that evidence to file an affidavit and obtain a search warrant in which to return to Johnson's apartment and confiscate the contraband. The observations by Officer Sorensen are listed as items 3 and 4 on his affidavit in support of the warrant he sought, which for convenience are restated:

3. On this day, April 13, 1982, your affiant was requested by Mr. Clevenger to enter the apartment and observe these plants and was let into the apartment by Mr. Clevenger and observed said plants.

4. Based upon your affiant's experience, he believes the plants to be marijuana and further believes that due to the large number of plants, additional useable material, paraphernalia and records will be located in said apartment.

Because this evidence was the result of Officer Sorensen's unlawful search, they must be deleted form the affidavit. *Segura, supra*, 104 S.Ct. at 3386; *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963); *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267–68, 84 L.Ed. 307 (1939). We therefore turn to the rest of the affidavit filed by Officer Sorensen to determine if it contains adequate facts by which the magistrate could have concluded that probable cause exists for issuance of the search warrant.[12]

The rest of the excised affidavit reads as follows:

1. Your Affiant received an Order to Respond to a suspicious call from Joe Clevenger, landlord of the above address.

---

12. We make this inquiry because of the rule originated in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920), that where police have a

source independent of the illegality from which they would have discovered the challenged evidence, the evidence seized is nevertheless admissible. *Accord, Segura, supra*, 104 S.Ct. at 3386.

2. Mr. Clevenger indicated that the individual renting apartment #7 had been told to move due to non-payment of rent. He further indicated that last night, April 12th, 1982, he had entered the apartment to see if the renter had moved and observed suspicious plants growing in five gallon buckets.

In determining the validity of a search warrant, as pertaining to the factual assertions contained therein, the United States Supreme Court recently reformulated its rules and standard of review. In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), the Court rejected the "rigidity" of the "two-pronged test" established by *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969), for a "totality of the circumstances" test. The *Gates* test amounts to the following:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Gates, supra,* 103 S.Ct. at 2332.

The Court went on further to articulate the standard of review for appellate courts in reviewing such magistrate decisions: "[T]he duty of a reviewing court is simply to ensure that the magistrate had a '*substantial basis for ... conclud[ing]*' that probable cause existed. *Id.,* quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960).[13]

In *State v. Lang,* 105 Idaho 683, 684, 672 P.2d 561, 562 (1983), this Court adopted the *Gates* "totality of the circumstances" test. Applying that test to the instant facts, we hold that the magistrate would not have found probable cause to issue the warrant based on the information which was properly before him.

 The information contained in the remaining two items of the supporting affidavit were conclusory, and provide no information as to the " 'veracity,' [or] 'reliability,' " *Gates, supra,* 104 S.Ct. at 2327, of Johnson's landlord. We also do not know in what way the plants were "suspicious." If by "suspicious" Johnson's landlord meant "suspected of being marijuana," there is nothing in the affidavit which indicates that Johnson's landlord could identify a marijuana plant if he saw one in the first place. To the contrary, the plain inference is that he could not, and did not. Thus, there is no evidence by which the magistrate could determine if Johnson's landlord had a proper "basis of knowledge," *id.,* to conclude as he did. As the Court of Appeals noted, the landlord did not describe in *any* way whatsoever the allegedly suspicious plants; nowhere is there a description of the plants' sizes, shapes, number of leaves, or color in terms that would have permitted the magistrate to determine if the plants were in fact contraband. *Johnson, supra,* 108 Idaho at 624, 701 P.2d at 244.

To rule that the affidavit does support a probable cause determination would constitute the "mere ratification of the bare conclusions of others." *Gates, supra,* 104 S.Ct. at 2332. This is something we refuse to do, and are prohibited from doing, under our Constitutions. Thus, we hold, based

---

**13.** The *Gates* Court re-emphasized the fact that an informant's " 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." *Gates, supra,* 104 S.Ct. at 2327. Further on in the opinion the Court states the following:

> Sufficient information must be presented to the magistrate to allow *that official* to deter-

mine probable cause; *his action cannot be a mere ratification of the bare conclusions of others.* In order to ensure that such an abdication of the magistrate's duty does not occur, *courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued. Id.* at 2332 (emphasis added).

upon items 1 and 2 of Officer Sorensen's affidavit, that there was not a substantial basis upon which the magistrate could have found that there was a fair probability that contraband would be found inside Johnson's home. "[G]iven all the circumstances set forth in the affidavit before him," *id.*, we hold that there was insufficient evidence by which the magistrate could have found probable cause.

Because the warrant was improperly granted, the search conducted pursuant to it was unlawful. Therefore, all evidence seized as a result of that search must be suppressed, and we so hold.

C. *The Exception to Application of the Exclusionary Rule Announced in United States v. Leon, supra, Is Inapplicable to the Facts of This Case.*

As mentioned above, *see* n. 9, *supra,* the United States Supreme Court in *Leon, supra,* 104 S.Ct. at 3419–20, provided yet a new exception to the exclusionary rule. The Court held that even where a search warrant does not issue upon probable cause, so long as the officer relied upon the warrant in objective good faith the exclusionary rule need not apply.

The *Leon* Court went on to discuss four instances in which the exclusionary rule is still applicable:

Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. ... The exception we recognize today will also not apply in

cases where the issuing magistrate wholly abandoned his judicial role ...; in such circumstances, no reasonably well-trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." ... Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient-*i.e.,* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. *Leon, supra,* 104 S.Ct. at 3421–22 (citations omitted).[14]

*Segura, supra,* decided the same day as *Leon,* amplified upon the various factual scenarios discussed in *Leon.* In *Segura* the Court stated that suppression would be justified when " 'the challenged evidence is in some sense the product of illegal government activity.' " *Segura, supra,* 104 S.Ct. at 3391–92, quoting *United States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 1250, 63 L.Ed.2d 537 (1980). The *Segura* Court went on to say that evidence would be suppressed if it would *not* have been discovered *"but for"* the illegal search. *Id.* at 3391. Thus, the thrust of *Leon* and *Segura,* to be sure, is that the exclusionary rule should only be employed when it will serve the deterrent effect for which it was created. *Leon, supra,* 104 S.Ct. at 3412–16, 3419; *Segura, supra,* 104 S.Ct. at 3385–86.

*Leon* and *Segura* have generated much debate.[15] We need not enter that debate and decide whether *Leon*'s "good faith"

---

**14.** The *Leon* Court nowhere states that this list is to be an exhaustive list. As we discuss below, the reasoning of *Segura* clearly reveals that the list herein quoted could not have been intended as being a comprehensive list for when the exclusionary rule shall apply.

**15.** In interpreting their own constitutions, the following states have rejected *Leon:* New York, *People v. Bigelow,* 66 N.Y.2d 417, 497 N.Y.S.2d 630, 488 N.E.2d 451 (N.Y.1985); New Jersey,

*State v. Novembrino,* 200 N.J.Super. 229, 491 A.2d 37 (A.D.1985); Wisconsin, *State v. Grawien,* 123 Wis.2d 428, 367 N.W.2d 816 (1985); Minnesota, *State v. Houston,* 359 N.W.2d 336 (1984).

The following states have adopted *Leon:* Indiana, *Mers v. State,* 482 N.E.2d 778 (Ind.App. 1985); Arkansas, *McFarland & Soest v. State,* 284 Ark. 533, 684 S.W.2d 233 (1985); Virginia, *McCary v. Commonwealth,* 228 Va. 219, 321

exception should be adopted as part of Idaho constitutional law, because we find it to be inapplicable to the facts of this case.

■ *Segura* clearly controls. "But for" Officer Sorensen's initial illegal search, he could not have executed the affidavit upon which the magistrate relied when he issued the search warrant. Contrary to *Segura*, where all the information included in the challenged warrant was derived from legal sources, and in no way connected to the prior police officer's admittedly illegal entry, here the information needed to support Officer Sorensen's affidavit—items 3 and 4—are not "wholly unrelated," *Segura, supra,* 104 S.Ct. at 3391, to the prior illegal search. Rather, they are the *fruit of that search,* and should thus be suppressed. *Id.* at 3386.

■ Another reason why *Leon's* good-faith holding is inapplicable is that application of the exclusionary rule in this case *will* serve a deterrent effect, which is *Leon's* requirement for determining when a court should apply the rule. *Leon, supra,* 104 S.Ct. at 3420; *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 3428, 82 L.Ed.2d 737 (1984) (decided the same day as *Leon* ). Ruling as we do today re-emphasizes to government officials the importance of obtaining a search warrant from a magistrate before conducting a search unless one of the several narrow, enumerated exceptions apply. Such a re-emphasis, we believe, will deter future unlawful police searches and seizures.

A final reason why *Leon's* good-faith exception is inapplicable is because the reason for the exception is not applicable here. The primary reason for the good-faith exception, as the *Leon* Court stated it, is that application of the exclusionary rule would have no deterrent effect where it was the

*judge* who committed the error that invalidated the warrant and not the police officer. *Leon, supra,* 104 S.Ct. at 3418. Here, however, the error was *not* committed by the judge. Rather, the error was committed by law enforcement personnel—the precise group of government officials to whom the exclusionary rule has been directed. Accordingly, *Leon's* good-faith exception is inapplicable. Thus, for the reasons stated above, we hold that the evidence obtained in this case should be suppressed.

## III. CONCLUSIONS

We must never forget the reasons for which the Framers of our constitutions adopted the Fourth Amendment to the United States Constitution and art. 1, § 17 of the Idaho Constitution. Time has perhaps dimmed our memory of the outrageous invasions of privacy and dignity the colonists suffered at the hand of British rule.[16]

We must also never forget that a violation of one person's Fourth Amendment and art. 1, § 17 rights is a violation of every person's rights. Only by suppressing the illegally obtained evidence, and deterring future illegal conduct, can a court effectively protect innocent people from impermissible invasions of their constitutional rights. As Justice Jackson eloquently stated:

> Courts can protect the innocent against [illegal] invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty.... *So a search against Brinegar's car must be regarded as a search of the car of Everyman. Brinegar v. United States,* 338 U.S. 160, 181, 69 S.Ct. 1302, 1313–14, 93 L.Ed. 1879 (1949) (emphasis added).

S.E.2d 637 (1984); Louisiana, *State v. Wood,* 457 So.2d 206 (La.Ct.App.1984); Missouri, *State v. Horsey,* 676 S.W.2d 847 (Mo.Ct.App.1984); Arizona, *State v. Bolt,* 142 Ariz. 260, 689 P.2d 519 (1984).

**16.** For a history tracing the underlying causes and eventual adoption of the Fourth Amendment, *see Matlock, supra,* 415 U.S. at 180–83, n. 1, 94 S.Ct. at 997–99, n. 1 (Douglas, J., dissenting).

Our holding today protects not just Johnson's rights but the rights of every person. Though the price to be paid is, occasionally, the suppression of incriminating evidence,[17] the benefit to be gained is the continued guarantee for every individual of decent privacy for his or her home, papers, and effects—a privacy "which is indispensible to individual dignity and self respect." *Harris v. United States*, 331 U.S. 145, 198, 67 S.Ct. 1098, 1120, 91 L.Ed. 1399 (1947) (Jackson, J., dissenting). In writing our constitutions, the Framers decidedly declared that an individual's privacy be the valued right—a right inviolate and only breachable upon strict compliance to constitutional requirements.

For the foregoing reasons, in agreement with the result expressed by the Court of Appeals, the judgment of the district court is reversed. The cause is remanded to the district court for further proceedings consistent herewith.

WALTERS, J. pro tem, concurs.

DONALDSON, C.J., concurring in Part I, concurring in the result in Part II, and specially concurring.

DONALDSON, Chief Justice, concurring to Part I, concurring to the result of Part II, and specially concurring.

I concur with the majority opinion of Justice Bistline to the extent that the facts of this case clearly indicate a search took place and not merely a viewing. The record indicates that when the landlord opened the door to the apartment, the officer observed that there were still personal items in the apartment which, according to the officer's own words, "indicated someone still lived there." At that point, the officer should have realized he could not enter the apartment without the consent of the tenant. Thus, he should have closed the door to the apartment and gone to get a warrant based on the affidavit of the landlord. What the officer did instead, again according to his own testimony, was to step five or six feet into the room. It was not until the officer had stepped five or six feet into the room that he was in a position to observe "suspicious plants." Hence, the act of walking into the apartment and looking around with the knowledge that the apartment was still occupied was a search. The officer had no warrant to search at that point and since there was no consent or exigent circumstances to justify a warrantless search, the search was illegal. Also, the warrant that was subsequently issued was based on the information acquired through this illegal search and, therefore, the warrant was also illegal.

While the fourth amendment to the United States Constitution serves to protect many places and things in which a person has a reasonable expectation of privacy, it most acutely protects against governmental intrusion into the sanctity of a person's home. *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). "Without question, the home is accorded the full range of Fourth Amendment protections." *Lewis v. United States*, 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966).

An officer cannot merely step into someone's home and "view" its contents in the same way he may view that person's yard from a public street or view a partially opened package at the post office. The expectations of privacy over a package in the mail and one's yard as seen from a public street are significantly less than the expectation of privacy one has in his own home.

In the case of the *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80

---

**17.** One researcher, in an exhaustive study, found that in those criminal cases involving a motion to suppress evidence, only ten percent of such motions were granted. B. Canon, "Is the Exclusionary Rule in Failing Health? Some New Data and a Plea Against a Precipitous Conclusion," 61 Kentucky L.J. 681, 721–22 (1974).

L.Ed.2d 85 (1984), the United States Supreme Court was dealing with a package that had been partially torn open by a forklift at an airport Federal Express office. Employees at the scene opened the package and a tube contained therein and discovered white powder in plastic bags. When federal narcotics officers arrived on the scene they observed the damage to the package and the tube and removed the plastic bags which the employees had put back into the package. The U.S. Supreme Court relied on the case of *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), which also involved a package which was the subject of a private search before it was searched by federal authorities. The court stressed that the invasion of privacy must, in such cases, be evaluated by the degree to which the government agents exceeded the scope of the private search. *Jacobsen, supra* at 114–15, 104 S.Ct. at 1657; *Walter, supra* at 657, 100 S.Ct. at 2402.

It is important to note that the court in *Walter* and *Jacobsen* did not analogize the private search of packages in the mail to private searches of one's home. *See, e.g., Walter, supra* at 654, 100 S.Ct. at 2400. The underlying assumption in both cases is that by putting the package into the complete control of a third party for transmission, the person who owned that package necessarily reduced his expectation of privacy in the package. This assumption is manifest in the court's statement that,

> "Such containers may be seized, at least temporarily, without a warrant. Accordingly, since it was apparent that the tube and plastic bag contained contraband and little else, this warrantless seizure was reasonable, for it is well-settled that it is constitutionally reasonable for law enforcement officials to seize 'effects' that cannot support a justifiable expectation of privacy without a warrant, based on probable cause to believe they contain contraband." *Jacobsen, supra* at 121–22, 104 S.Ct. at 1661.

I cannot accept the argument that the defendant's home in this case is subject to the same lack of justifiable expectations of privacy as the package in *Jacobsen*. The United States Supreme Court has not, and I believe would not, go so far as to equate the two. To do so would be to permit an officer to enter and search without a warrant through every piece of personal property in one's home simply because a third party, such as a landlord, had done so previously. As the Colorado Supreme Court stated in *People v. Brewer*, 690 P.2d 860 (Colo.1984), "The decision in *Jacobsen* was based in part on the minimal intrusion involved in the governmental search of an unwrapped package, and has never been used to justify an invasion of privacy as substantial as entry into a house." *Id.* at 864 n.3.

If a warrant had been issued upon the authority of an affidavit of the landlord as to what he observed in the defendant's apartment, the fact that his observations were the result of an unauthorized private entry of the apartment would not have tainted the warrant. *Id.* at 863. This is the type of responsible law enforcement activity the fourth amendment and the exclusionary rule are intended to encourage. Unfortunately, the officer attempted to shortcut this process and the result is evidence tainted by an illegal search.

Justice Bistline, however, goes much farther in his analysis of the exclusionary rule than the facts of this case warrant. Hence, I concur only in the result of Part II. Suffice it to say that in this state, "evidence, procured in violation of defendant's constitutional immunity from search and seizure, is inadmissible and will be excluded if request for its suppression be timely made." *State v. Rauch*, 99 Idaho 586, 592–93, 586 P.2d 671, 677–78 (1978). Therefore, this Court should be content to hold that (1) the officer's warrantless search was illegal, (2) the warrant that was subsequently issued was based upon information acquired through the illegal search

and, therefore, was also illegal, and (3) the illegally obtained evidence should be excluded.

SHEPARD, Justice, dissenting.

Although this is a very close case, I dissent, and would affirm the decision of the district court in refusing to suppress the evidence.

There is absolutely nothing in the record to sustain the contention that the police officer went to the apartment with any intent to search or seize. The record reveals to the contrary. The landlord contacted the police, who dispatched Officer Sorenson who was "told by the dispatcher to go to 267 South Ridge, Apartment No. 1, that they had a suspicion report there." There is no indication that the officer wished to enter the apartment, but rather he was invited by the landlord to enter the apartment. The officer did not[*] ask the consent of the landlord to enter the apartment, but rather the landlord opened the door, pointed behind the door, and requested the officer to look. Hence, I see no relevance in any of the cases cited involving situations where police desired to enter premises and sought the permission of a landlord or some other third person to enter premises. Rather, I see the circumstances of this case as similar in type to *Eisentrager v. Hocker*, 450 F.2d 490 (9th Cir.1971) and almost indistinguishable from *Lucas v. State*, 381 So.2d 140 (Miss.1980).

Implicit in the opinion of Bistline, J. and that of Donaldson, C.J. is the assertion that the officer stood in the open doorway, observed items which led him to believe that the apartment was still occupied by the defendant, but nevertheless the officer then proceeded into the apartment and conducted a search. I emphatically disagree that such was the evidence. It is clear to me that while the officer was proceeding into the apartment he noted the personal items and looked behind the door.

At the hearing on the motion to suppress, counsel for the defendant stated:

"Your honor, I would stipulate to the facts of the initial entry as they are recited, or as they were testified to by Officer Earl Sorenson at the Preliminary Hearing." At the preliminary hearing Officer Sorenson testified as follows:

"At the time, I contacted a Joe Cleverly at 267 South Ridge, Apartment No. 1, who stated that they had a tenant living in Apartment No. 7 that was behind on the rent, and they had told him to move, and Cleverly stated that he had went down the night before to clean the apartment, suspecting that the tenant had moved out. As Cleverly and I were speaking, he was guiding me down to Apartment No. 7, and he stated, as he opened the door, he said that he had found these and was pointing behind the door.

"*As I went into the apartment,* I observed several personal items that indicated that someone still lived there. As I looked behind the door, I observed two plastic containers that had small green plants growing in them. I observed the plants closer and supposed them to be marijuana.

"At that time, Cleverly and I exited the room, locked it, and I advised him not to let anyone in the apartment until I returned.

"Q. What did you next do, Officer?

"A. I went directly to the Prosecutor's Office to advise him of what I had found, and to obtain a search warrant to go back and search and seize the merchandise."

(Emphasis added; Tr., Prelim.Hrg., p. 5).

The majority asserts: "There simply is no evidence in this case from which Johnson's landlord could have concluded that Johnson had abandoned his apartment. On the contrary, the record reveals that numerous personal effects were found in Johnson's home, suggesting that, far from abandoning his home, he was still living there." I do not believe that statement is supported by the record. The only testimo-

ny as to any items observed in the apartment was that Officer Sorenson and Detective Edwards returned to the premises with a warrant and found in the apartment some 45 marijuana plants, a set of scales, and plastic bags. The only other items mentioned in the record were a plate on which marijuana seeds were soaking and an employment application form with the name of the defendant thereon. These latter two items were concealed from the view of Sorenson when he first entered the apartment.

Upon cross-examination of Officer Sorenson during preliminary hearing, the following testimony was taken:

"Q. Did you ask Mr. Cleverly to see inside the apartment?

"A. No, I didn't.

"Q. He voluntarily let you in?

"A. Yes.

"Q. Just you and Mr. Cleverly?

"A. Yes.

"Q. Was anybody else present?

"A. No there wasn't.

"Q. You indicated you observed behind the door. Did you look anywhere else in the apartment?

"A. At that time, no, I didn't.

"Q. Is that all you observed that was suspicious was two plants behind the door?

"A. There were approximately—at that time, I just approximated it as 20 plants in the two five-gallon containers.

"Q. How far did you enter into the apartment?

"A. Approximately five, six feet. I just observed behind the door.

"Q. You simply entered the room and looked behind the door?

"A. Right.

"Q. You indicated this was a two-room apartment. Did you enter the other room?

"A. No I didn't, not at this time.

"Q. Did you open any cabinets or boxes or anything of a closed nature?

"A. No I didn't."

(Tr., Prelim. Hrg., pp. 9–10).

The opinion of Bistline, J. states:

"If the state were to have its way on this point, it would apparently argue that the following scenario is outside constitutional protection: A private citizen ransacks a home, claiming to be in search of contraband. Upon discovering the alleged contraband, the citizen calls in the police who conduct a second ransacking of the home, looking and searching everywhere and inspecting everything as did the citizen. According to the state, because the officer is only 'viewing' the citizen's efforts—'merely' retracing the citizen's footsteps—such government activity is outside the purview of federal and state constitutional protections. Such an abberational view is not harmonious with what the framers of our federal and state constitutions intended when they put these protections into our constitutions, and we so hold." (At 1293).

I suggest that the above-quoted language is overblown in the circumstances of this case. Cleverly was not called as a witness at either the preliminary hearing nor at the hearing on the motion to suppress. Hence, we are not aware of whether he believed the apartment had been abandoned. His statements to Officer Sorenson were hearsay and hence cannot be accepted for the truth of the facts asserted therein. Nevertheless, it is my view that the actions of Officer Sorenson were reasonable under all of the circumstances. He did not seek to enter the apartment. Rather he was escorted to the apartment by the landlord who opened the door and pointed behind it. To look behind the door he stepped into the apartment five or six feet. At some point in time as he "went into the apartment" he saw items which indicated that someone still lived there. We are not told by the record what type of personal items these were, and for all the record shows he may have been referring to other plants or the plastic bags. In any event, Sorenson did

not "conduct a second ransacking of the home, looking and searching everywhere and inspecting everything." Rather, I believe there is a strong probability, and the trial court on this record was justified in finding, that Sorenson was led to believe by Cleverly that the apartment had been abandoned, and after he had entered five or six feet into the apartment he came to the conclusion that it had not been abandoned. At that point he left and secured a warrant for a search of the premises. I cannot believe that such conduct on the part of a police officer need be condemned nor that the exclusionary rule need be applied in the instant case. In *State v. Pontier*, 95 Idaho 707, 518 P.2d 969 (1974), this Court upheld a denial of a motion to suppress in circumstances where indeed, in the absence of a warrant, a general search was conducted after marijuana had been observed by the police growing outside the house.

I would affirm the action of the district court in denying the motion to suppress.

BAKES, J., concurs.