Jerry McFARLAND and Richard SOEST *v.*
STATE of Arkansas

CR 84-76                                        684 S.W.2d 233

Supreme Court of Arkansas
Opinion delivered February 11, 1985

536

*Howell, Price & Trice,* by: *William L. Trice, III,* for appellant.

*Steve Clark,* Att'y Gen., by: *Theodore Holder,* Asst. Att'y Gen., for appellee.

DARRELL HICKMAN, Justice. This case arises out of the October 29, 1982, armed robbery of Al Horn and his family at their home near Mountain Home, Arkansas. Jerry McFarland and Richard Soest, the appellants, and Mike McCracken, the state's chief witness, were charged with burglary, robbery and theft of property, in connection with the incident. McFarland, Soest and McCracken were charged in other counties with a number of similar crimes during the same time period. One involved the robbery and kidnapping of James Pate, a Jacksonville, Arkansas, pawn shop owner, and another involved Forrest Wood, a businessman in Marion County. McFarland and Soest were convicted of burglary, robbery and theft of property in connection with the Horn robbery. McFarland was sentenced to 60 years. Soest had six prior convictions and was sentenced as a habitual criminal to 90 years in prison. On appeal they make eight arguments concerning procedural matters. We find no prejudicial error and affirm their convictions.

Al Horn, a dealer in precious metals, was robbed at his rural home, which is a mile from the Missouri border. He, his wife, and his teenaged son were bound and gagged by two masked men. The men stripped them of their jewelry, took Horn's briefcase, and threatened Horn with death if he did not reveal the location of his safe and the combination. The thieves were unable to open the safe and forced Horn to open it. The men took approximately $7,500 in cash, a 1901 five dollar gold piece, several rings, including a "snake" ring, a diamond cluster ring, and Mrs. Horn's solitaire

diamond engagement ring. Horn's money clip was taken and at least five firearms were stolen, including a 410 shotgun, a wallet derringer, and a Colt revolver. A Puma hunting knife was stolen, as well as jeweler's eyepieces, vials of diamonds, many other pieces of jewelry, and scrap gold. Also taken were various coins. The robbers left in Horn's silver Honda automobile. The victims could not identify their robbers beyond describing their builds.

After James Pate was robbed and kidnapped in Jacksonville on January 11, 1983, the authorities were able to determine through tire tracks that McCracken might have been involved. The investigation led to Baxter County. McCracken and McFarland were both questioned and ultimately arrested. When McFarland was arrested he was wearing a wristwatch, which belonged to James Pate.

McCracken gave a number of statements to the authorities. Just two days before trial, a bargain was struck that, in exchange for his testimony in the Al Horn case, he would receive only a 10 year suspended sentence and a $2,500 fine for that crime. He testified that he planned the robbery of Horn with McFarland, who owned a game machine business and an interest in a local restaurant. McFarland called McCracken the morning of October 29, 1982, and asked him to meet him and his "buddy" at J & J Sales, which was the building McFarland used for his game machine business. The buddy was Richard Soest. It was decided that they would rob Horn that day. McCracken drove his blue and white Chevrolet truck. He let Soest and McFarland out near Horn's home at approximately noon so that they could be there when Horn's son came home from school. They then waited for Mr. and Mrs. Horn to arrive home from their shop in Mountain Home. McCracken was to return to an appointed place nearly between 7:00 and 7:15 p.m. to pick them up. He testified that when Soest and McFarland left him they had a gorilla and "spiderman" mask, two pistols, brown jersey gloves and duct tape. McCracken returned to the spot about 6 p.m. About an hour and fifteen minutes later, Soest and McFarland drove up in a small silver car and told him to follow them. He followed them into the woods and they threw a pillow case into the back of the truck.

McCracken said McFarland had on a gorilla mask which he took off and threw away. According to McCracken, McFarland said he had thrown a 410 shotgun into the woods. The three returned to J & J Sales and emptied the pillow case. Inside were a brief case, several pistols, scrap gold, coins and other things. McCracken said that he saw no jewelry. He was told they did not have time to go through it and it was hidden in a video game machine. McFarland told McCracken that they had not gotten anything else and paid him $300 for driving.

McCracken testified that in the early part of December, he accompanied McFarland to Cabot and sold some items of jewelry to Bill Pitchford, McFarland's stepbrother. Pitchford gave McFarland a check, which he cashed that day. Then Pitchford took them to Jacksonville where McFarland sold James Pate a solitaire diamond ring that was later identified as Mrs. Horn's. McFarland told Mr. and Mrs. Pate that the ring belonged to Mrs. Don House who was ill. The Pates bought the ring for $800 and a rifle. The Pates corroborated this testimony. The Pates also testified that McFarland came back a few days later and sold them a ring, which was identified as the Horns' cluster ring, and several gold coins, among which was a 1901 gold piece. He also had other rings and a vial of diamonds.

A search of McFarland's home was made and found were a Puma hunting knife, stacks of bills, Horn's money clip, jeweler's eyepieces, vials of pennies, Lincoln head pennies, foreign coins, a brown jersey glove, a pillow case, and a Halloween gorilla mask. At J & J Sales, in video and pinball machines, were found numerous weapons, many of which had their serial numbers removed. Among them were Horn's wallet derringer and a Colt pistol. Horn's car was found six or seven miles from his home on the day of the robbery and a spiderman mask and a Halloween, ghoul-type, mask were found nearby.

McFarland testified that McCracken had ill feelings towards him. He said that he was a bookie and that McCracken had a gambling debt to him of over $8,000 in early October. He said that when McCracken was pressed to

pay it, he brought him the stolen merchandise that was found in his possession. He readily admitted that he assumed the merchandise was stolen and that he knew of the Horn robbery. He admitted possessing the rings and coins and sellimg them to the Pates. He denied that he had told the Pates the solitaire ring belonged to anyone. He testified that he did not sell anything to Bill Pitchford and that McCracken had sold him the jewelry. He testified that Bill Pitchford made out the check in payment for the scrap gold to him simply because Pitchford owed him some money and McFarland cashed the check and paid McCracken his part from the sale of the gold. He said a stack of one thousand one dollar bills was part of his payoff from McCracken. He also testified that on October 29, 1982, he had worked at his restaurant in the morning, worked on a friend's plumbing in the afternoon, and spent the entire evening at the restaurant. Soest's defense was essentially an alibi also.

At the Horn's home was found a piece of paper with the writing, "4 times to left." There was testimony that indicated one of the robbers might have written down part of the combination to Horn's safe. According to a handwriting expert, the writing was made by Soest. Hairs taken from the spiderman mask were matched with Soest's.

Although no argument is made as to the sufficiency of the evidence or as to sufficient corroboration of McCracken's testimony, this recitation of facts is necessary to an understanding of the arguments made.

The major point for reversal concerns evidence heard by the jury of other crimes with which McFarland and Soest were charged. A motion in limine was granted ordering that no mention be made of the other crimes. It was agreed there would be no such mention. It was a difficult case to try for all involved simply because of the tangle of facts which concerned the crimes that were to be kept from the jury.

The appellants complain about several statements made. One occurred when McCracken was asked on cross-examination about his plea bargain, and he responded by describing the agreement, but then said: "I am still charged

in Baxter County and Pulaski County, like the others." The defense moved for mistrial. There is no evidence that this was a deliberate statement nor can we say that the offhand remark prevented the defendants from getting a fair trial. The trial judge, in his discretion, denied the motion for mistrial and observed that the defendants' names had not been mentioned nor any crimes. Mistrial is a drastic remedy and one which must be let to the discretion of the trial judge. *Nolen* v. *State*, 278 Ark. 17, 643 S.W.2d 257 (1982). We find no prejudicial error. *Price* v. *State*, 268 Ark. 535, 597 S.W.2d 598 (1980).

The other issue with regard to evidence of other crimes is more complicated. The state's case against the appellants depended on the credibility of McCracken and James Pate, and the defense concentrated on attacking their credibility. The jury had to choose whom to believe. When McCracken was arrested, he gave several statements regarding his role in the various crimes. On cross-examination the defense, at least twice, attempted to point out inconsistencies between his testimony and the prior statements. Yet these statements were given in connection to other crimes as well as to the Horn robbery. The state naturally complained that its hands were tied in trying to rehabilitate McCracken because of the motion in limine, and that the defense was forcing McCracken to perjure himself.

Then, when James Pate was being cross-examined, he was asked if he knew Soest. Rather than mention his robbery, Pate answered "I better not say that." When asked if he had ever been in the shop, Pate answered, "No sir, let me say no. I don't know what to do on that. Do I have to answer it." Again the complaint was made that the defense's tactics were forcing the state's witness to perjure himself. At a recess the state made this objection:

Your Honor, let the record reflect that the state objects to the kinds of questions asked of the last witness. It places them in the untenable position of the witness having to perjure themselves because of the nature of the question asked. Mr. Soest was in an armed robbery that occurred on the 10th or 11th of January, 1983 and

that caused the pause of the witness and his answer in which he had to say no, rather than answer the question truthfully under the prior directives of this Court not to mention any other offenses.

Soest's attorney: I didn't anticipate that response, your Honor, as soon as I realized we were getting into that area, I got off of it.

The Court: This is two or three times that this has come up. The next time I may let the witness go ahead and answer.

The same thing transpired when the defense was attempting to impeach McCracken. The following took place in chambers:

State's attorney: Your Honor, the problem Mr. Mc-Cracken has in answering the question just posed to him by [Soest's attorney] is that [Soest's attorney] has indicated the $150 cash on this statement has to do with the Al Horn case when in fact, the problem with that is, if the Court will read this $150 cash has to do with another robbery that was being discussed and the figure involved with respect to the Al Horn thing is at the bottom of the next page and it says $150 to $200 and when [Soest's attorney] alluded to this figure the witness was unable to answer that question because it relates to another robbery.

The Court: That is what the Court understands.

State's attorney: I don't know how to deal with this before the jury. It is the same thing time and time again, to make him look like a fool in front of the jury when he is just completely unable to answer those kinds of questions under the orders of the Court.

The Court: That is what the Court understands and that is the reason we are taking this recess.

Soest's attorney: If he is saying he got $150 to $200 he

should have pointed to this statement down here. All I can say is I just saw this statement for the first time here in the courtroom. That was the result of a rather hurried reading, your Honor. I will not again refer to that $150 at the top of the page.

The Court: I think the jury understands the inaccuracies here. We are getting awfully repetitive.

Until McFarland was cross-examined late in the trial, the state had avoided the mention of the other crimes, although as illustrated, it caused considerable difficulty. On cross-examination McFarland was asked whether he was wearing a wrist watch taken from Pate in an armed robbery. Then McFarland was asked whether he was in possession of fire arms stolen from Pate. This is the other evidence that the appellants claim prevented them from receiving a fair trial. In our judgment the questions were fair because the entire theory of the defense was that McCracken was lying about the robbery and the circumstances of McFarland's possession of the stolen property, especially that taken to Cabot and Jacksonville. While McFarland admitted that he was guilty of possessing stolen property and being a bookie, he contended that he was totally innocent of burglary and robbery and a victim of McCracken's vengeance and the Pates' mistaken memory. The defense tried several times to use the facts of the other crimes to impeach witnesses and then used the motion in limine to protect their own witnesses. As the trial court aptly stated:

There's just been several instances where you haven't phrased your question right which has caused problems with the witnesses being able to respond or take tactical advantage for the defense, and it's solely because of the reason this Court has kept the existence of multiple other charges against these same defendants from being presented to this jury. The rule is for a shield and not for a sword and you all are using it for a sword.

Unif. R. Evid. Rule 404(b) provides that other crimes may be admissible to show absence of mistake and that is the

theory the state argues is applicable here. But it is our judgment that the evidence of possession of other stolen items was admissible to impeach McFarland's testimony. The state's case depended on whether the jury believed McFarland or McCracken and their versions of the possession of the stolen property and its sale. The defense cannot tie the state's hands with regard to any mention of what occurred in Jacksonville, while being allowed to present any version whatsoever as to McFarland's possession of the stolen property. McFarland admitted he possessed stolen property but tried to paint himself as completely innocent of any other involvement. We find no prejudicial error. The peculiar, complicated facts, which unavoidably involve several crimes, and the theory of the defense, dictate our conclusion.

Numerous allegations of error are made regarding the trial court's rulings on discovery. The state furnished the defense with a detailed list of the evidence that they intended to use in July of 1983, two months before the September 19 trial. A pretrial hearing was held September 2 concerning discovery and other matters. On that date a motion for continuance was made and the court stated:

> Gentlemen, this matter was set for trial in May, continued on defense motion. It was set for trial in July and was continued on defense motion . . . [I]f you are going to use three attorneys, or four attorneys, there is always going to be conflicts that the attorneys are going to have and I suppose the more attorneys that you bring into the case, the more conflicts, but this Court has got no time for a time to slot this trial in until the latter part of January. That's where my schedule is. And I have already granted two continuances in this matter, so we are going to go to trial in this case on the 19th of September.

The defense complained that the following items were not furnished to them pursuant to the discovery order: all of Soest's handwriting exemplars, results of the test on Soest's hair by Steve Cox, a report concerning the stolen weapons, the plea agreement between the state and McCracken, results

of McCracken's polygraph test, a witness whose name did not appear on the witness list provided the defense, telephone records of Soest and McFarland, and a federal form used by pawn brokers when purchasing weapons.

The state conceded that it had not delivered all the examples of the handwriting of Soest taken in connection with analyzing the note which read "4 times to left." It was the posture of the defense that it could not adequately prepare for the trial and get its expert to make these comparisons without these handwriting samples. There is no prejudice since the state said it would limit its offer of proof and omit from evidence any testimony based on examples which were not furnished. It should also be pointed out that evidently what the defense wanted were samples of Soest's handwriting which were obviously available to the defense. Furthermore, no proffer is reflected in the abstract that the defense had a handwriting expert that would testify if he were present.

A criminal investigator for the state, Jim Carr, sent hair samples taken from several suspects to the state laboratory for tests. He got the results over the phone and took notes from the call. He testified that he was told the results were positive with regard to a match between hairs from the spiderman mask and hairs taken from John Dillard. It was the posture of the defense that these notes should have been admitted because they were exculpatory. The state said that it had no tests that it could have given the defense and was able to satisfy the trial court that no actual test results were officially made by the state. The trial court ruled that this was hearsay evidence and inadmissible. We cannot say, based on this record, that the court was clearly wrong. Furthermore, the testimony was allowed, only the notes were excluded.

The defense moved for a continuance, because it was not made aware of plea negotiations regarding McCracken. The court stated that it could find no prejudice because of surprise because the defense knew since July that McCracken would be a witness for the state. No agreement was reached until Friday before trial and the defense was

informed of the particulars on Monday, the first day of trial. Inasmuch as the defense knew that McCracken would testify, no prejudice has been demonstrated.

Objection was made to the admission of numerous telephone records of McFarland, but it was not disputed by the defense that these records were in the state's files and available to them from July. The defense could have had them for the asking. It was the posture of the defense that the state should have the records duplicated and sent to them in response to the order of the court. The court observed several times that, in its judgment, the defense chose to remain ignorant regarding a good deal of the evidence of the state. We must agree that the record bears out the trial court in this judgment.

Numerous guns, seized from McFarland's place of business, were introduced into evidence and several of them had their serial numbers removed. McCracken testified that he had seen McFarland filing off the serial numbers on several of the guns. The defense argued that it had not been informed that tests were going to be performed upon the weapons which would reveal the serial numbers. According to the testimony of one expert, it was established that a .38 pistol was one of those taken from Horn. He could not say regarding a .22 derringer, although it was generally identified as a weapon taken from Horn. The record reflects that the defense was furnished the report on the weapons two weeks before trial, and we find no prejudicial error. Nor do the appellants show how they could possibly be prejudiced by introduction of the federal form used by pawn brokers when buying and selling weapons. Furthermore, the form was withdrawn from the jury after the objection.

McCracken testified that he made an anonymous call to the sheriff's office in Gainesville, Missouri, telling them that the Horns had been robbed, were tied up and should be released. The state had listed as a witness to corroborate this statement the telephone operator at the sheriff's office. Instead, another person, who was present at the office and heard the call, testified. Objection was made that this was a violation of the rules of discovery. No objection was made

until after the close of the testimony and the defense has not demonstrated in any way how they were prejudiced.

As McCracken was being cross-examined by the defense, it was revealed that he had been given a polygraph examination. Objection was made at this point, because the defense had requested copies of all statements by McCracken and they had not been furnished with the results of the polygraph. The state was able to convince the court that they did not have the questions nor the results of the polygraph and did not consider it a statement. The defense was given at least three statements that McCracken had made to the authorities, which were inconsistent, and it was able to present the inconsistencies to the jury. McCracken admitted that he had lied to the police when he made these statements. We find no prejudice.

Another argument is that the trial court erred in allowing Mrs. Horn to testify that she was sexually assaulted during the robbery, because neither of the appellants had been charged with sexual assault. We have had similar questions arise in cases where, during the course of one crime, an assault of some kind or another is inflicted upon the victim. We have found the testimony to be relevant as a circumstance connected with the particular crime being tried. The evidence is necessary to present a clear picture of the crime and its aggravated nature. *Thomas* v. *State,* 273 Ark. 50, 615 S.W.2d 361 (1981); *Butler* v. *State,* 261 Ark. 369, 549 S.W.2d 65 (1977); *Banks* v. *State,* 187 Ark. 962, 63 S.W.2d 518 (1933).

The appellants contend that the trial court abused its discretion in admitting evidence that was not connected to the crime with which they were charged. One item introduced was a gorilla mask found at McFarland's home. The appellants argue that this was unnecessary and irrelevant because two masks were found by Horn's car, a spiderman and a ghoul-type mask, which were the type described by Horn as being worn by the robbers. However, McCracken testified that McFarland was wearing a gorilla mask when he returned from the Horns'. His credibility was crucial to the state and the fact of McFarland's possession of

that mask bolstered his credibility. Furthermore, Horn testified that one of the robbers was wearing a hairy Halloween mask. Rulings as to relevance are within the trial court's discretion. *Kellensworth* v. *State,* 278 Ark. 261, 644 S.W.2d 933 (1983). Here, since these items matched McCracken's description, there was no error.

The appellants next contend that the trial court erred when it allowed the state to ask McFarland why he was in possession of a sawed-off shotgun. In support of their contention, the appellants state that no shotgun was reported stolen and that no one testified that a shotgun was used in the robbery. The record disputes both assertions. McCracken testified that McFarland and Soest discussed throwing a shotgun into the woods after the robbery. Horn reported a shotgun stolen. McCracken also testified that he saw McFarland altering firearms. The record does not reflect whether the shotgun referred to in the question was Horn's. But McFarland denied any knowledge at all of any of the stolen items found at his place of business and inquiry into his possession of a shotgun could be considered relevant to bolstering Horn's and McCracken's testimony. Again, this was a discretionary ruling for the trial judge, and we find no error.

The next argument concerns the victim of another crime, Forrest Wood, visiting with potential jurors outside the courtroom prior to voir dire. Mr. Wood, a prominent businessman in the next county, was robbed and the appellants were charged with the crime. The defense moved for a mistrial. The court then questioned the jurors and excused any which might conceivably have been prejudiced by talking to Mr. Wood. There was no evidence at all that Wood mentioned his robbery. Wood left the courtroom until the trial began. The defense asked the prospective panel if anyone knew Mr. Wood and one woman answered that she did. She was excused by the trial court. The appellants have not been able to demonstrate that their case was prejudiced by this incident.

In connection with this matter, the appellants argue that they did not receive a fair trial because one of the jurors,

Mrs. Elaine Albertson, failed to respond when asked if she knew Forrest Wood. After the trial began the defense moved for a mistrial because they had learned that she was the secretary in an insurance agency that had processed Wood's claim after he was robbed. Shortly after the trial began, Mrs. Albertson was questioned out of the hearing of the jury. She readily admitted knowing Mr. Wood and that she had processed his claim. She denied knowing that the appellants were accused of the crime and no evidence was presented that she did. The defense did not ask her why she had remained silent when the jury panel was asked if they knew Forrest Wood. After the trial, two affidavits, identical in their wording, were filed by the appellants which stated that Mrs. Albertson's employer and Wood were both officers in a Yellville Savings and Loan, that Mrs. Albertson admitted reading the Baxter County newspaper, that the paper always mentioned the Forrest Wood and Al Horn cases together, and that Forrest Wood had been present throughout the trial.

The trial judge was satisfied that a mistrial should not be granted. The record does not reflect that Mrs. Albertson lied and in this regard we have to give deference to the trial court. This is not like the case of *Walton* v. *State*, 279 Ark. 193, 650 S.W.2d 231 (1983), where a juror said that she knew nothing of a case and yet had sat in on the defendant's first trial. Perhaps Mrs. Albertson should have answered affirmatively when the panel was asked if anyone knew Wood, and we cannot say why she did not. However, later she was certainly candid about the matter. Indeed, the defense could have asked her whether she had heard the question and why she remained silent in order to better demonstrate error.

Whether a juror or jury is impartial is a judicial question addressed to the sound discretion of the trial court, and a manifest abuse of the discretion must be demonstrated by the appellants. *Holland* v. *State*, 260 Ark. 617, 542 S.W.2d 761 (1976). The appellants in this case have been unable to demonstrate an abuse of that discretionary authority, which was their burden. *Beed* v. *State*, 271 Ark. 526, 609 S.W.2d 898 (1980).

Four search warrants were issued by the Baxter County Municipal Judge in connection with McFarland's property. The appellants filed a motion to suppress because the warrants were not returned to the issuing officer in accordance with A.R.Cr.P. Rule 13.4 and because three of them could have been executed at any time during the day or night. A.R.Cr.P. Rule 13.2 requires that warrants shall provide that they be executed between the hours of 6 a.m. and 8 p.m., unless the issuing officer finds that it needs to be executed at night for various stated reasons. Only one search could clearly be characterized as a nighttime search. It took place at 12:30 a.m. The affidavit supporting the warrant stated that the items were in danger of imminent removal. That is a ground for a nighttime search. *Murray* v. *State*, 275 Ark. 46, 628 S.W.2d 549 (1982). Another search took place between 7:30 and 8:30 p.m. We find no merit to the contention that this violated Rule 13.2. *Brothers* v. *State*, 261 Ark. 64, 546 S.W.2d 715 (1977).

The issuing officer testified that he did not get the warrants back as required by Rule 13.4. He said, however, that he directed the prosecutor to file them with the circuit court. We find no substantial violation when viewed in light of Rule 16.2(e) which provides in pertinent part:

> Determination. A motion to suppress evidence shall be granted only if the court finds that the violation upon which it is based was substantial, or if otherwise required by the Constitution of the United States or of this state.

The failure to return the warrants to the issuing officer was not willful and caused the appellants no prejudice. In view of recent United States Supreme Court decisions, we have no difficulty in deciding that these searches were reasonable. *United States* v. *Leon*, ___ U.S. ___ , 104 S.Ct. 3405 (1984); *Massachusetts* v. *Sheppard*, ___ U.S. ___ , 104 S.Ct. 3424 (1984).

An argument is made that the state implied to the jury that the defendants had the burden of proof in the case. An investigator was asked on cross-examination if he had taken

fingerprints and hair samples from the various pieces of evidence. The inference seemed to be that the officer and others had not proceeded as vigorously in seeking suspects as they might have once they had evidence against those on whom they had already focused the investigation. The defense mentioned several times during the trial that several other men undoubtedly had the kind of reputations and similar physical descriptions which could point suspicion as to their participation in the crime. After this cross-examination, the prosecutor asked on redirect "Have any of the lawyers for Mr. McFarland asked to have the items from the home and business of Mr. McFarland available to them to test for fingerprints or hair samples." At most, the question was harmless error in view of the complexity of the trial, the overwhelming evidence against the appellants, and the problems which both the state and the defense encountered in seeing that a fair trial was given to these defendants.

We find that the appellants did receive a fair trial.

Affirmed.