Jimmy Dale PATTERSON *v.* STATE of Arkansas

CR 91-33 815 S.W.2d 377

Supreme Court of Arkansas
Opinion delivered September 9, 1991

*Val P. Price*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Senior Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. The appellant, Jimmy Dale Patterson, was tried by jury, convicted of murdering Stanley Dunham, and sentenced to life imprisonment. He has raised four points of appeal. He first contends the court should have directed a verdict of acquittal for three reasons: (1) the State failed to prove the killing occurred in the course of a robbery, and thus there was no proof of the underlying offense necessary for a conviction of capital felony murder pursuant to Ark. Code Ann. § 5-10-101(a)(1) (Supp. 1989); (2) venue was improperly laid in Craighead County because the killing occurred in Greene County; and (3) the State's evidence proved the killing occurred in self defense. Patterson's second point is that the Trial Court

improperly admitted evidence of a statement made by Patterson despite a promise made during a pretrial hearing that the statement would not be used. His third contention is that two inculpatory statements he made while in custody were not voluntary and should not have been admitted into evidence. Finally, Patterson contends the "fee cap" statute limiting the amount to be paid to counsel appointed to represent indigent criminal defendants is unconstitutional.

We affirm the conviction. There was evidence from which the jury could have concluded the killing occurred in the course of a robbery. Some of the acts requisite to the murder occurred in Craighead County, thus venue was not improperly laid, and the jury was not required to believe evidence of self defense. Thus, we find no error in denial of the directed verdict motion. We find no prejudice resulted from admitting evidence of the statement the State may have agreed to exclude, and we find the totality of the circumstances indicates that the other statements were voluntarily made. Nor is there merit in the "fee cap" argument because Patterson has not demonstrated that his case was prejudiced as a result of the legislative limit on the fee to be paid his appointed counsel.

Stanley Dunham's body was found in his car in Craighead County. The body and car had been burned, and the body was beyond recognition. The remains were identified by scientific means. Patterson was arrested and questioned about the death on January 13, 1990. He denied knowing Dunham, and his statement was generally exculpatory. Patterson was held in the Craighead County jail that night, and officers found a piece of paper in Patterson's billfold with Dunham's name and address on it.

On January 14 Patterson made another statement. In it he admitted having killed Dunham. He said both he and Dunham had dated Judy Stone. He knew Dunham had come to Jonesboro from his Ohio home, and he called Dunham at Dunham's room at the Holiday Inn. Dunham came to Patterson's apartment house, and they got into an argument in the parking lot. Dunham threatened Patterson, and Patterson shot Dunham once in the upper body with a single shot .22 caliber gun, placed the body in Dunham's car, and drove the car to a place called "Hill Top"

where there was a telephone booth. Patterson said he called his son to bring gasoline to him. After telling his son to go "down the road," he splashed the gasoline around in the car and then set it afire. An explosion occurred, and Patterson suffered burns on his arms. Patterson had removed two pistols, a pocket knife, a wrist watch, and over $1000 cash from Dunham's body or from the car. Patterson said he then went to his hometown in Tennessee where he gave his father $600 in exchange for a check in that amount which he later deposited in a bank account.

Yet another statement was taken from Patterson on January 15. In it he discussed in great detail his relationship with Judy Stone and a woman named Peggy Brown. Stone worked for Dunham during the time she and Patterson had a relationship. She travelled to Ohio to help Dunham in his business from time to time. Dunham sent her money while she was in Arkansas. She told Patterson that Dunham made a lot of money but that his children kept him "drained" financially. She also told Patterson that Dunham was obsessed with her and would be dangerous to them if they married or continued their relationship. She assured Patterson that she and Dunham had had no sexual relationship, but Patterson was suspicious anyway, and he knew she had a relationship with yet another man in Indiana.

Patterson said that during the time Stone spent in Ohio he developed a relationship with Peggy Brown. When Stone returned to Arkansas from a five-week stay in Ohio, Patterson and Stone got back together, and Patterson asked Brown to stop seeing him. Brown persisted, however, and was with Patterson when he killed Dunham.

In the January 15 statement, Patterson gave substantially different details about the killing. He said when he called Dunham at the Holiday Inn, he mentioned Stone and said they needed to talk. Dunham agreed to meet him at a place on highway 69 in Greene County. Patterson waited on Dunham who drove to the appointed place. When their cars were stopped four or five feet apart facing opposite directions, Patterson said Dunham put his hand in his coat pocket as if to draw a gun. Patterson picked up his single-shot .22 from the floorboard of his car and shot Dunham. He then got out of his car and went to Dunham. He found no gun in Dunham's jacket but did find a .44 caliber pistol

on the seat of Dunham's car. He stuffed Dunham's body in the trunk of Dunham's car, and removed items from the car and from the body. The burning of the car with gasoline brought by Patterson's son, occurred much as he had said in his January 14 statement, with the additional detail that Peggy Brown drove Patterson's car back to Patterson's apartment.

Patterson told yet another version of the killing in his trial testimony. He said that he wanted to meet Dunham to talk him out of trying to marry Stone. He called Dunham at the Holiday Inn and asked him to meet at the highway 69 location, but when they met there, both got out of their cars and Dunham said "Young man, I am going to marry Judy Stone." Patterson replied that it would not happen, and that he had been going with Stone for two years. Dunham then went "into a rage," and came toward Patterson as if to "bear hug" him. Patterson said he struck Dunham and turned back toward his car when he heard Dunham say "I'll kill you." Patterson said he then jumped in his car and attempted to drive away but wound up at the dead end of a gravel road. Dunham approached in his car and stopped at an angle near Patterson's car, and that was when the shooting took place.

### 1. Directed verdict

### a. Evidence of robbery

Patterson was charged with capital murder as defined in Ark. Code Ann. § 5-10-101(a)(1) (Supp. 1989). The relevant portion of the statute makes a killing capital murder if it is committed in the course of or furtherance of robbery. The argument here is that a verdict should have been directed in favor of Patterson on capital murder because the State did not prove that the robbery was anything other than an afterthought occurring after Dunham was dead.

 Patterson is correct in stating that the State did not present any evidence directed to whether Patterson had formed an intent to rob Dunham prior to his having killed him. There was evidence that Patterson had been in financial straits as late as a month before the killing, and he had heard from Stone that Dunham made a lot of money but was relieved of most of it by his children. The circumstantial evidence consisting of the close proximity of time and place of the killing and the taking of the

decedent's property so as to make it all one transaction is sufficient to allow the jury to conclude the killing occurred in the course of a robbery. *Pomerleau v. State*, 303 Ark. 275, 795 S.W.2d 929 (1990); *Owens v. State*, 283 Ark. 327, 675 S.W.2d 834 (1984); *Grigsby v. State*, 260 Ark. 499, 542 S.W.2d 275 (1976).

### b. Venue (jurisdiction)

Patterson contends that, as the killing occurred in Greene County, the Craighead County Circuit Court was without authority to try him for it. Arkansas Code Ann. § 16-88-105(b) (1987) provides, "[t]he local jurisdiction of circuit courts . . . shall be of offenses committed within the respective counties in which they are held." Section 16-88-108(c) provides, however, "[w]here the offense is committed partly in one county and partly in another, or the acts, or effects thereof, requisite to the consummation of the offense occur in two (2) or more counties, the jurisdiction is in either county."

In *Hill v. State*, 253 Ark. 512, 487 S.W.2d 624 (1972), we reviewed these statutes and similar ones, as well as decisions under them, in other states. Although it was not the holding of the *Hill* case, we concluded for the purpose of guiding the trial court on retrial that these laws are remedial and to be construed liberally.

In *Thrash v. State*, 291 Ark. 575, 726 S.W.2d 283 (1987), the evidence showed that Thrash hatched a plan in Desha County to steal a vehicle. The murder and robbery occurred in Lincoln County, but the body was returned by Thrash to Desha County. In *Pilcher v. State*, 303 Ark. 335, 796 S.W.2d 845 (1990), Pilcher met his victim in Saline County and invited him to Grant County where the robbery and homicide occurred. Pilcher then brought the body back to Saline County. We held Thrash and Pilcher were properly tried in Desha and Saline Counties respectively because in those counties "acts requisite to the consummation of the offense" had occurred. The cases are virtually indistinguishable from this one on this issue, and we conclude the Craighead County Circuit Court had jurisdiction of the alleged offense.

### c. Self defense

Patterson argues, without citation of authority, that his defense of self defense was established as a matter of law because the only evidence the state put on with respect to how the killing took place consisted of Patterson's statements of January 14 and 15, in each of which he said he killed Dunham out of fear that Dunham was about to shoot him.

The Trial Court's instruction to the jury described self defense as an affirmative defense. Patterson made no objection to the instruction. *Cf.* AMCI 4105, the model instruction on use of force in defense of a person which contains no such description. At one point in the instruction given in this case, the Trial Court stated that Patterson had the burden of proving self defense by a preponderance of the evidence. At another point the instruction stated that his burden was only to raise a reasonable doubt as to his guilt.

In his argument, Patterson states that "the appellant has the burden of proof by a preponderance of the evidence the affirmative defense of justification self-defense and the use of deadly force." The State also argues that self defense is an affirmative defense, citing Ark. Code Ann. § 5-2-607(a) (1987) which states the conditions under which a person is justified in using deadly force, and § 5-1-111(d) (1987) which states that a defendant must prove an affirmative defense by a preponderance of the evidence. The State then cites *McCaslin* v. *State*, 298 Ark. 335, 767 S.W.2d 306 (1989), in which we made it clear that a jury is not required to believe a defendant's evidence on the affirmative defense of entrapment.

Neither of the statutes cited by the state defines justification or self defense as an affirmative defense. In *Peals* v. *State*, 266 Ark. 410, 584 S.W.2d 1 (1979), this Court, considering the propriety of an instruction on "choice of evils," stated, "We think the matter of justification was treated as an affirmative defense at the trial. However, justification is not an affirmative defense. . . . It becomes a defense when any evidence is offered tending to support its existence and such evidence may be introduced by either side. *Thomas* v. *State*, 266 Ark. 162, 583 S.W.2d 32 (1979)." AMCI 4105 provides a defendant is only required, in asserting the defense, to "raise a reasonable doubt" in

the jurors' minds. In *Doles* v. *State*, 275 Ark. 448, 631 S.W.2d 281 (1982), we held that an accused was entitled to an instruction on justification where there was some evidence of self defense. We wrote, "Justification is not an affirmative defense which must be pled, but becomes a defense when any evidence tending to support its existence is offered to support it," citing the *Peals* and *Thomas* cases.

■ Regardless of the Trial Court's mistake in describing justification or self defense as an affirmative defense and in giving two standards of proof, one of which was erroneous, there was no reversible error because no objection was made to the instruction. Indeed the error may have been induced by the fact that Patterson treated self defense as an affirmative defense from the outset of the litigation and filed a "Notice of Intent to Raise Affirmative Defense" reciting "Justification — Use of Deadly Physical Force in Defense of a Person a/k/a self defense."

Even in a capital murder case, a defendant must make a contemporaneous objection at trial to preserve a claim of error for review. *Parker* v. *State*, 292 Ark. 421, 731 S.W.2d 756 (1987); *Fretwell* v. *State*, 289 Ark. 91, 708 S.W.2d 630 (1986).

■ The *Thomas* case provides the answer to Patterson's argument that his unrebutted statements presented by the state prove self defense as a matter of law. We pointed out that we are not required to view the evidence most favorably to the defendant. The opposite is true. The jury is not required to believe all of the defendant's statements about what happened at the time of the homicide. It may accept or reject any part of the testimony of a witness. *Gilliam* v. *State*, 294 Ark. 117, 741 S.W.2d 631 (1987). In this case the evidence was certainly sufficient to show that Patterson killed Dunham, and there is nothing in the record to cause us to conclude that self defense or justification was, as a matter of law, proven by either party.

## 2. The January 13 statement

At the pretrial suppression hearing, the prosecution stated it would present only the voluntariness of the January 14 and January 15 statements for review because it had no intention of introducing the January 13 statement into evidence. Yet at the trial, the statement, which was exculpatory, was sought to be

introduced for impeachment purposes.

Patterson moved to exclude the statement, and the Trial Court held a hearing out of the presence of the jurors to determine its admissibility. It was shown that clearly there was no surprise to Patterson or his counsel who had known of the statement. The only argument seems to be that the State should not have broken its "promise." Patterson cites no authority on this point and makes no argument which convinces us that any unfair prejudice resulted from the introduction of the statement. This court does not reverse in the absence of a showing of unfair prejudice. *Berna* v. *State*, 282 Ark. 563, 670 S.W.2d 434 (1984), cert. denied, 470 U.S. 1085 (1985).

### 3. The January 14 and 15 statements

Patterson contends he asked for an attorney each time he spoke with the sheriff's deputies who took statements from him. The officers testified either that he made no such request or that they could not recall him making it. Patterson contends that at one point when he asked for an attorney to advise him, the officers interviewing him sent for a deputy prosecutor who did not speak to him directly but who answered questions he had about possible sentences by relaying the answers through a sheriff's deputy. The officers testified that a deputy prosecutor was at the jail where they questioned Patterson for up to 30 minutes, and they did ask him questions in connection with the case, but they did not recall that he was called there as a result of Patterson's request for the assistance of a lawyer.

Patterson also contends he was promised that, if he confessed, the death penalty would be waived and his son and Stone would not be sent to prison.

The issue of voluntariness of an inculpatory statement given by an accused in custody is one this Court determines after looking at the "totality of the circumstances" displayed by the record. *Weaver* v. *State*, 305 Ark. 180, 806 S.W.2d 615 (1991). The trial court must resolve conflicts in testimony, and we will not reverse unless the decision in that respect is clearly erroneous. *Fuller* v. *State*, 278 Ark. 450, 646 S.W.2d 700 (1983).

Patterson has given us nothing to suggest that the Trial Court in this case was clearly erroneous in choosing to believe the

officers rather than Patterson on these questions.

### 4. The "fee cap"

In *Arnold* v. *Kemp*, 306 Ark. 294, 813 S.W.2d 770 (1991), this Court held unconstitutional the statute limiting fees which can be paid to an indigent defendant's appointed counsel. We had previously held, however, that we would not reverse a conviction on the basis of the constitutional inadequacy of the law unless it were shown that the complaining defendant's trial was prejudiced by the inadequacy of the fee paid his counsel. *Coulter* v. *State*, 304 Ark. 527, 804 S.W.2d 348 (1991). Patterson has made no such showing.

### 5. Rule 11(f)

As this is a case in which there is a sentence to life imprisonment, the record has been reviewed for all objections decided adversely to Patterson, and we find no error.

Affirmed.