Bennie CLEVELAND *v.* STATE of Arkansas

CR 93-188                                              865 S.W.2d 285

Supreme Court of Arkansas
Opinion delivered November 15, 1993
[Supplemental Opinion on Denial of Rehearing
December 13, 1993]

94

*Thomas D. Deen*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Brad Newman*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. In this case, the appellant, Bennie Lamar Cleveland, seeks to overturn his conviction on charges of capital murder, attempted capital murder, kidnapping, aggravated robbery, and theft of property. He raises five points on appeal, but none of his arguments merit reversal.

The record reveals that Cleveland had been involved in a tur-

bulent relationship with Paula Easter of McGehee, Arkansas, for about two years when it ended in December 1991. At the time, Ms. Easter was employed as a cook by Cash's Quik Check, a convenience store in McGehee. The appellant persisted in attempting to contact Ms. Easter, phoning her and her aunt repeatedly and going once to her workplace, in violation of orders from his parole officer, Danny Calvert.

Subsequently, on the evening of December 29, 1991, Cleveland and a companion, Wendell Moton, drove to Cash's Quik Check. The appellant was armed with a .22-caliber pistol, and Moton carried a shotgun. Moton went inside, purchased some ice cream, and returned to the car to report that Ms. Easter was at work. Then Cleveland and Moton together entered the store with their weapons.

Ms. Easter and a co-worker, Michelle Nagel, were seated in a booth with a customer, Willard Blackmon. The appellant approached the table and fired at Ms. Nagel, killing her where she sat. Mr. Blackmon tried to escape, but Cleveland shot and wounded him. Next, he chased Ms. Easter through the building and ordered her to come out of a cooler where she had attempted to hide. She told Cleveland, in response to his question, that she did not know how to open the cash register.

The appellant took Ms. Easter outside and ordered her to get in the car. He then returned to the store, where he was observed by the wounded Mr. Blackmon, and emerged shortly afterward, carrying a handgun and a box containing cash. Cleveland then drove to Little Rock, where he left Moton, and began an odyssey that would eventually take him and Ms. Easter to New Jersey, where they were arrested by a state trooper on January 4, 1992.

A jury trial was held before the Desha County Circuit Court in July 1992. Cleveland was convicted on all charges. The kidnapping and aggravated robbery charges were merged in the capital murder conviction, and the appellant was sentenced consecutively, under an amended judgment, to life without parole for the capital murder of Michelle Nagel, thirty years for the attempted capital murder of Willard Blackmon, and ten years for the theft of property.

*I. Motion for directed verdict on aggravated robbery*

At the conclusion of the State's case, the appellant moved for a directed verdict on the issues of aggravated robbery and kidnapping "as a portion of" the first and second counts of the amended information, which covered, respectively, the capital murder and attempted capital murder charges. On appeal, Cleveland actually argues only with respect to the underlying aggravated robbery charge.

■■ On appeal, before considering other assignments of error, this court determines the sufficiency of the evidence. *Gunter* v. *State*, 313 Ark. 504, 857 S.W.2d 156 (1993). An appeal from the denial of a motion for a directed verdict is a challenge to the sufficiency of the evidence, and the test for determining the sufficiency of the evidence is whether there is substantial evidence to support the verdict. *Friar* v. *State*, 313 Ark. 253, 854 S.W.2d 318 (1993).

■■ Substantial evidence is that evidence which is forceful enough to compel a conclusion, one way or the other, beyond suspicion or conjecture. *Gunter* v. *State, supra.* We view the evidence in the light most favorable to the State. *Walker* v. *State,* 313 Ark. 478, 855 S.W.2d 932 (1993).

Cleveland contends that there was simply no proof of any prior intent on his part to commit a robbery at Cash's Quik Check. Instead, he argues, the evidence shows that the murder of Michelle Nagel and the shooting of Willard Blackmon occurred before the act of robbery. The appellant asserts that the proof indicates that he re-entered the convenience store after the shootings and after Ms. Easter had been placed in the automobile. The entire sequence of events, he claims (citing the testimony of his co-defendant, Wendell Moton), revolved around his relationship with Ms. Easter.

Other testimony, however, suggests a closer relationship between the shootings and the robbery. Jo Ann Owens, the store manager, stated that she was called to the business at about 10:00 p.m., shortly after the crimes were reported, and that she discovered that a pistol and a money box were missing. She also found that the cash register contained no large-denomination bills. Ms. Owens determined that approximately $400 in cash had been taken.

Ms. Easter testified that, after placing her in the car, Cleve-

land went back inside the store and returned with her purse and the money box which was ordinarily kept under the counter beneath the cash register. Moton corroborated this testimony, adding the detail that the money box was "beige" in color.

The most compelling evidence came from Mr. Blackmon, who had been shot in the back and arm. As he lay upon the floor, pretending to be dead, he heard one of the co-defendants say, "You got the money sack. Let's go. Let's go." Presently, he saw Cleveland come back inside. "He had a key in his hand," Mr. Blackmon testified, "and put it in the cash register and tried to open it. . . . Then when he couldn't get it, he went on back out the door."

██ It appears that Cleveland, on appeal, is urging that the sequence of events is dispositive of the question of his "intent to rob" — i.e., he suggests that the robbery was an afterthought because it occurred after the murder had been committed. Yet, as this court declared in *Grigsby* v. *State*, 260 Ark. 499, 508-09, 542 S.W.2d 275, 280-81 (1976):

> Where the robbery and the killing are so closely connected in point of time, place and continuity of action as to constitute *one continuous transaction* it is proper to consider both as a single transaction and the homicide as a part of the res gestae of the robbery. [Citations omitted.] *The sequence of events is unimportant and the killing may precede, coincide with or follow the robbery and still be committed in its perpetration.* [Citations omitted.]

> . . . Where the circumstances permit an inference that the killing and the robbery were all part of one transaction, the state is *not required to prove intent to commit the felony by direct evidence.* [Citations omitted.] . . .

> (Emphasis added.) It is the close proximity of events, rather than their particular order, that makes possible an inference of a single continuous transaction.

These principles have recently been reaffirmed in *Owens* v. *State*, 313 Ark. 520, 856 S.W.2d 288 (1993), where we held, quoting *Grigsby*, that when the defendant had been placed at the scene of the crime approximately one hour before the body of a murder victim was discovered and when money previously in the vic-

tim's possession was missing, the jury was justified in deciding that the robbery and murder were one continuous transaction.

So, too, in *Sanders* v. *State*, 310 Ark. 510, 838 S.W.2d 359 (1992), we found sufficient circumstantial corroborating evidence to establish robbery as the underlying felony in a capital felony murder case. There, the owner of a building in which the victim engaged in a bootlegging enterprise testified that he had visited the victim on the night of the murder and that he found him alone, in good health, and well-provisioned with beer and whiskey. On his return the next morning, however, he discovered the victim lying in a pool of blood and about six cases of beer and twenty half-pints of vodka and whiskey missing, along with some money he had given the victim the night before.

In *Patterson* v. *State*, 306 Ark. 385, 815 S.W.2d 377 (1991), there was no direct evidence of the defendant's intent to rob his victim before murdering him, though there had been testimony presented regarding the defendant's financial situation and his belief that the victim made a lot of money. We shifted the focus, however, to the actual criminal episode: "The circumstantial evidence consisting of the close proximity of time and place of the killing and the taking of the decedent's property so as to make it all one transaction is sufficient to allow the jury to conclude the killing occurred in the course of a robbery." 306 Ark. at 389-90, 815 S.W.2d at 380.

Here, as in the cited cases, the robbery and the murder occurred in close proximity to each other. A victim-witness stated that one of the co-defendants mentioned a money bag before leaving the store. Two other witnesses agreed that, after shooting two people and forcing a third to accompany him, Cleveland went back to the store and returned to the car with a money box. The store manager testified that a pistol, a money box, and $400 in cash were missing when she was called to the scene at about 10:00 p.m. The jury had before it enough evidence to indicate that the robbery and the murder formed a single continuous transaction. The trial court did not err in refusing to grant Cleveland's motion for a directed verdict.

## II. Supplemental jury panel

By the third day of jury selection, the regular panels of both divisions of the circuit court were exhausted. The trial judge direct-

ed the circuit clerk to draw a supplemental panel, using variants of two random numbers — 17 and 82 — selected by the court for pulling the district-wide master jury list. The circuit clerk, in turn, gave the numbers to an employee, who ran them through a computer and generated one hundred fifty-five names. The trial judge then personally instructed the clerk to attempt to find telephone numbers for those listed and ordered him, in the judge's words, to "start from the top of the list and work down" in order to avoid a "courthouse panel" consisting of friends and acquaintances of courthouse personnel.

Because voir dire was underway, there was no time to employ the usual method of notification by letter. Forty-one supplemental panel members received telephone notice and reported for duty the next morning. Of the twelve jurors who were finally seated, five were drawn from the supplemental panel.

Cleveland maintains that the trial court erred in denying his motion to quash the supplemental panel. The appellant, who is black, argues that the telephone summons of supplemental panel members resulted in the unlawful exclusion of black prospective jurors. Out of the forty-one additional venirepersons who reported to the circuit court, only three were black. According to the 1990 census, 42.5 percent of Desha County residents are black.

In *Huckaby* v. *State*, 262 Ark. 413, 557 S.W.2d 875 (1977), this court specifically approved the practice of reaching prospective jurors by telephone, despite the appellant's contention in that case that the method amounted to a systematic exclusion of the large class of eligible jurors without telephones. The trial judge, in overruling the motion to quash the panel, explained that "We were in the process of selecting a jury in this case. We ran out. We had to take the most expedient method. One juror is as good as another." 262 Ark. at 416, 557 S.W.2d at 877. This court upheld the ruling.

The scenario in the present case is similar — the examination of venirepersons was underway, and completion of that phase of the proceedings had become a matter of some urgency. It cannot be overemphasized that the critical factor in *Huckaby* was the fact that voir dire was in progress at the time the telephone summons was authorized. We noted that "Whatever might have been the proper procedure before the trial, it was certainly within the

trial court's discretion to approve the most expeditious method of bringing in more jurors after the trial was already in progress." *Id.* The same rationale applies here.

In another case, *Kitchen v. State*, 264 Ark. 579, 572 S.W.2d 839 (1978), we reversed a conviction where, on the morning of the day that trial was scheduled to begin, it was discovered that the prospective jurors had not been notified to appear, and the circuit judge instructed the sheriff to summon a portion of the panel by phone. We contrasted those circumstances with the situation in *Huckaby v. State*:

> There we held that it was permissible to summon additional jurors, during a recess, by telephone since it was within the trial court's "discretion to approve the most expeditious method of bringing in more jurors after the trial was already in progress." Here the initial summoning of prospective jurors for the trial of this case was solely by telephone upon four hours' notice. We are of the view that our holding in *Huckaby* should not be extended to approve this procedure.

264 Ark. at 581, 572 S.W.2d at 841. In the present case, as in *Huckaby* and unlike *Kitchen*, additional venirepersons, not the initial panel members, were summoned by telephone.

■ Personal notice by telephone is a statutorily sanctioned means by which prospective jurors may be summoned. Ark. Code Ann. § 16-32-106(b)(2) (Supp. 1993). *See King v. State*, 312 Ark. 89, 93, 847 S.W.2d 37, 40 (1993), where this court approved the telephone summons of additional jurors, holding that "There was no breach of statutory procedure under these circumstances."

■ ■ The selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to trial by jury. *Sanders v. State*, 300 Ark. 25, 776 S.W.2d 334 (1989). There is, however, no requirement that the petit jury actually chosen must mirror the community and reflect the various distinctive groups in the population. *Id.* A defendant in a criminal trial is entitled to require that the state not deliberately or systematically deny to members of his race the right to participate, as jurors, in the administration of justice. *Waters v. State*, 271 Ark. 33, 607 S.W.2d 336 (1980). It is the state's purposeful or deliberate denial to blacks, on account of race, of par-

ticipation in the administration of justice by selection for jury service that violates the equal protection clause. *Id.*

As we pointed out recently in *Walker* v. *State*, 314 Ark. 628, 864 S.W.2d 230 (1993), the appellant bears the burden of proving the systematic exclusion of members of his racial group from the venire. In order to establish a prima facie violation of the fair-cross-section requirement, the appellant must show that (1) the group alleged to be excluded is a distinctive group in the community; (2) the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Walker* v. *State, supra; Sanders* v. *State, supra.*

Cleveland attempts to characterize the selection process in the present case as discretionary and thus discriminatory. Yet the numerical method utilized in drawing the supplemental panel was strictly random in operation. A showing that a particular jury panel is not representative of the racial composition of the population will not support a motion to quash the panel, for when the panel is drawn by chance, such a showing does not in itself make a prima facie case of racial discrimination. *Thomas* v. *State*, 289 Ark. 72, 709 S.W.2d 83 (1986).

It must be emphasized that it is not enough simply to cite statistics — a policy or procedure entailing the systematic exclusion of a particular group must be shown in order to cross the threshold and shift the burden of proof to the State. Here, Cleveland failed to make a prima facie showing of racial discrimination in the jury selection process. Like the appellant in *Walker* v. *State, supra*, he was unable to offer any evidence of systematic exclusion.

In the present case, the circuit court was dealing with an emergency situation in which voir dire was underway and seven jurors had been seated. It is clear from a reading of the transcript that the trial judge took pains to ensure fairness by giving specific instructions to the circuit clerk, who, in turn, passed the court's directions along to his staff.

The circuit judge stated for the record that, when it became necessary to create a fresh pool of prospective jurors, he picked two random numbers between one and one hundred from a list he has

used for the purpose during the past several years. He gave those numbers to the circuit clerk, Skippy Leek, and outlined the procedure to be followed:

> These two numbers were given to Mr. Leek, whom I understand gave them to Jerri Cingolani downstairs, who ran them through the computer, and it generated a hundred and fifty-five names on a list. . . .

> My instructions, after consulting with Mr. Leek and seeing what resources we had available, were for him to get as wide a distribution within the courthouse as he could of that list so as many people from the various communities and areas of the counties could have a chance to look at it and make notes and respond for people that they knew, because we have no telephone numbers. It is my understanding they took the telephone books from the county, Dumas, McGehee, and I guess the Arkansas City and whatever outlying areas, and they attempted to get phone numbers for as many of these people as they could in addition to identifying them from anyone in the courthouse who might know them.

> Now, I indicated my concern that they start at the top of the list and work down, that it was not a matter of picking out who you know or picking out your friends, that I did not want a, quote, courthouse panel coming in here, not in a derogatory sense . . . but not just acquaintances and friends of employees and officials of the courthouse.

The trial court thus emphasized the importance of proceeding in alphabetical order rather than singling out persons known to the clerk's staff.

Called as a witness by the appellant, the circuit clerk, Skippy Leek, testified that registered voters in the judicial district are listed alphabetically in the courthouse computer. The computer selected persons whose order on the alphabetical listing ended in the pair of double-digits randomly picked by the judge —*e.g.*, 17, 82, 117, 182 — and produced a list containing one hundred fifty-five names.

Mr. Leek stated that, following the directions of the trial court, he instructed courthouse personnel to proceed with the list alpha-

betically. Deputy Sheriff Roy Fryar, who assisted in telephoning potential jurors, testified that the calls were made in alphabetical order.

Personal acquaintance played a limited but expedient part in the clerk's instructions to his deputies. Ms. Irvin and June Robnolt, another deputy clerk who made telephone calls, were told to come up with numbers for as many people on the list as practicable. If, for instance, they knew an individual, they were to attempt to locate that person at work; if they knew a woman whose married name might be different than that shown on the list, they were to locate her by using her married name.

One person listed, Warren Radar of Arkansas City, had no telephone but was known to staff members and personally contacted by a law enforcement officer. (The record does not indicate Mr. Radar's race.) Another person listed, Rose Daniels, a black woman who was eventually seated as a juror, was reached by telephone after a friend of hers, who happened to be in the circuit clerk's office on other business, supplied her number.

The randomly derived supplemental list did not identify prospective jurors by race; that list, of course, was based on voter registration lists, which do not reveal the voters' race. *See Thomas v. State, supra.* Consequently, the trial court had no evidence before it regarding how many blacks may have been listed among the one hundred fifty-five additional names or how many may actually have been contacted. According to deputy clerk Sandra Irvin, "We tried to contact every name that was on the supplemental list. I don't know how many names are on that list. . . . When we got through, I did not count. I do not know how many were contacted or how many showed up."

The record merely reflects that three black venirepersons reported to duty after having been notified by telephone, two of whom were impaneled for trial. However, nothing in the evidence presented by the appellant suggests that these figures resulted from the systematic exclusion of blacks from the jury selection process, which was random, not selective, in its inception and execution.

In short, the appellant has failed to establish a prima facie case of racial discrimination. Hence, the trial court did not err in refusing to quash the supplemental panel.

### III. Batson and gender

Cleveland made an objection, based on the principle set forth in *Batson* v. *Kentucky*, 476 U.S. 79 (1986), forbidding the state's exercise of race-based peremptory challenges, to the alleged gender-biased nature of the prosecution's strikes in the present case. Nine of the State's ten peremptory challenges were used to remove women from the jury pool.

■ Of particular significance in the present case is the appellant's own gender. That inescapable fact affords him no standing to assert a claim that he suffered prejudice as a result of the State's peremptory challenges. Moreover, the jury that was ultimately impaneled consisted of five females and seven males.

### IV. Venireperson's remark

During the general voir dire, a prospective juror, Pam Ferguson, responding to a question addressed to the group concerning contact with trial participants, said, "Well, my husband, Ronnie Ferguson, works for the Dumas Police Department. He has arrested Bennie several times." The trial court initially granted Cleveland's motion for a mistrial based on the remark but subsequently withdrew the ruling, pending the completion of individual voir dire and an assessment of the potential tainting of the panel. Following the conclusion of individual voir dire, the trial court denied the defense motion.

The case law in this area speaks clearly. In *Novak* v. *State*, 287 Ark. 271, 698 S.W.2d 499 (1985), this court upheld a trial court's refusal to declare a mistrial when a police officer on the jury panel, in response to the court's general query as to acquaintance with the defendant, volunteered, "I have arrested him several times in the past." We found no abuse of the trial court's discretion in denying a mistrial, observing that the chance remark was inadvertent and the arrests were not specified. *See also Cobbs* v. *State*, 292 Ark. 188, 728 S.W.2d 957 (1987); *McFarland* v. *State*, 284 Ark. 533, 684 S.W.2d 233 (1985).

■ A mistrial should be avoided except where the fundamental fairness of the trial itself is at stake. *Snell* v. *State*, 290 Ark. 503, 721 S.W.2d 628 (1986). Here, as in *Novak*, the

remark was inadvertent, and the number of arrests and the reasons for arresting the appellant remained indefinite. Within the context of an entire week of voir dire, Ms. Ferguson's chance remark, which was made on the first day of the jury selection process, cannot be said to have tainted the jury panel. The trial court did not err in refusing to order a mistrial.

### V. Parole officer's testimony

At the time Cleveland committed the offenses for which he was convicted in the present case, he was a parolee under the supervision of parole officer Danny Calvert. In the weeks prior to December 29, 1991, two of the victims, Michelle Nagel and Paula Easter, and several of Ms. Easter's relatives notified Mr. Calvert about the appellant's efforts to contact Ms. Easter. Mr. Calvert then ordered Cleveland to stop phoning or otherwise attempting to reach Ms. Easter. The appellant, as events proved, failed to heed Mr. Calvert's admonition.

By a motion in limine, Cleveland endeavored to prevent Mr. Calvert from testifying, asserting that the prejudice resulting from the revelation that the appellant was on parole at the time the crimes were committed would outweigh the probative value of the testimony. The State contended that Calvert's testimony was necessary to support the testimony of Ms. Easter and her relatives regarding the nature of the relationship between Ms. Easter and Cleveland and to counter a statement that the appellant had made following his arrest that he and Ms. Easter had together planned the robbery of the convenience store.

The trial judge denied the motion in limine, declaring that Mr. Calvert was an "occurrence witness" who would offer substantive testimony. He ordered the prohibition of references to Cleveland's prior convictions or incarcerations by other witnesses and pointed out that it was the appellant who had put the allegation of Ms. Easter's participation in the crimes in issue. Further, he stated that he would caution the jury to give no consideration to Mr. Calvert's status as Cleveland's parole officer. The judge then specifically found that the probative value of Mr. Calvert's testimony, when coupled with the admonition, would outweigh any prejudicial effect.

Before Mr. Calvert was brought to the witness stand, the

State had called Ms. Easter's aunt, Hattie Mae Brown, who described the numerous telephone calls she had received from the appellant and stated that, on December 20, 1991, she "went to his [Cleveland's] parole man," whom she identified by name as Danny Calvert. The appellant offered no objection to this reference to the identity and status of Mr. Calvert.

After Mr. Calvert took the stand and testified that he was Cleveland's parole officer, the trial court admonished the jury "not to infer or speculate or to consider anything else that may have to do or you think may have to do with his position." At the conclusion of the parole officer's testimony, Cleveland moved for a mistrial, contending that Mr. Calvert's testimony served merely to divulge the appellant's criminal past.

■ On the stand, Mr. Calvert made no reference to the appellant's previous convictions. Although some of his testimony duplicated that of Ms. Brown and other family members, he made substantive additions, as the appellant concedes, with reference to his warnings to Cleveland about trying to contact Ms. Easter and Cleveland's stated confusion about his relationship with Ms. Easter. The mere fact that some of the evidence offered by Mr. Calvert was cumulative is not a basis for holding that its admission, otherwise proper, constitutes an abuse of the trial court's discretion. *Harris* v. *State*, 295 Ark. 456, 748 S.W.2d 666 (1988). Such a consideration does not warrant invocation of the drastic remedy of mistrial. *See King* v. *State, supra.*

## VI. *Rule 4-3(h) review*

Because the appellant was sentenced to life imprisonment without parole, the record in this case has been examined in compliance with Rule 4-3(h), formerly Rule 11(f), of the Rules of the Supreme Court. Although the appellant failed to abstract all adverse rulings as required by our rule, the State has appropriately cured this deficiency in its supplemental abstract. We have determined that there were no rulings adverse to the appellant that constituted prejudicial error.

Affirmed.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
### DECEMBER 13, 1993

Petition for Rehearing denied.

*Thomas D. Deen*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Brad Newman*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. In his petition for rehearing, Bennie Cleveland challenges this court's holding in *Cleveland v. State*, 315 Ark. 91, 865 S.W.2d 285 (1993), on the issues of the supplemental jury panel, the application of the *Batson* principle to gender, and the sufficiency of the abstract. We deny the petition but address the *Batson*-gender question in order to correct our original opinion.

Addressing Cleveland's third point for reversal, we gave unduly short shrift to his argument that the principle set forth in *Batson* v. *Kentucky*, 476 U.S. 79 (1986), forbidding the state's exercise of race-based peremptory challenges, should be extended to embrace his claim that the prosecution's strikes exhibited gender bias. Of the State's ten peremptory challenges, nine were used to remove women from the jury pool. The jury's final composition numbered seven males and five females.

In our opinion, we stated that Cleveland, as a male, lacked standing to assert a *Batson*-gender argument. In doing so, we failed to acknowledge the appellant's citation of *Powers* v. *Ohio*, 499 U.S. 400 (1991), in which the United States Supreme Court held that, under the equal protection clause, a white male defendant in a criminal proceeding had standing to object to the State of Ohio's use of peremptory challenges to remove seven black venirepersons from the jury. Notwithstanding the erroneous statement in our opinion, we conclude that a rehearing is not required because the trial court did not err in refusing to extend the *Batson* doctrine to encompass gender.

A division of authority exists at both the federal and state levels concerning the appropriateness of advancing the *Batson* standard within the realm of gender. As the State has pointed out, the majority of courts that have ruled on the question have declined to do so. Three of the four federal circuits that have considered the matter have held that *Batson* should not be expanded so far.[1] Eight of the thirteen state courts that have dealt with the issue have also rejected arguments that *Batson* should apply to sex as well as race.[2]

The United States Supreme Court will have the opportunity to resolve the question during the present term when it entertains the case of *J.E.B.* v. *Alabama*, 92-1239. *See J.E.B.* v. *T.B.*, 606 So.2d 156 (Ala. Civ. App. 1992), *cert. granted*, ___ U.S. ___, 113 S.Ct. 2330, 124 L.Ed.2d 242 (1993). In *Tucker* v. *State*, 313 Ark. 624, 855 S.W.2d 948 (1993), we declined the opportunity to extend *Batson* to "gender challenges within a racially cognizable group" on the basis that "no reason or authority" had been provided to support the innovation. 313 Ark. at 630, 855 S.W.2d at 951. With regard to Cleveland's argument, we believe that the weight of reason and authority rests with the State's position.

Of particular significance in the present case is the fact that the gender composition of the jury that was ultimately impaneled here was five females and seven males. Other jurisdictions that have treated the gender issue under similar circumstances offer instructive guidance. In *State* v. *Harrison*, 805 P.2d 769 (Utah App. 1991), the appellate court found it unnecessary even to

---

[1] *See United States* v. *Broussard*, 987 F.2d 215 (5th Cir. 1993); *United States* v. *Nichols*, 937 F.2d 1257 (7th Cir. 1991); *United States* v. *Hamilton*, 850 F.2d 1038 (4th Cir. 1988). Only the Ninth Circuit has held that *Batson* should be extended to gender-based strikes. *See United States* v. *DeGross*, 913 F.2d 1417 (9th Cir. 1990), *aff'd en banc*, 960 F.2d 1433 (9th Cir. 1992).

[2] See *Murphy* v. *State*, 596 So.2d 42 (Ala. Cr. App. 1991); *Potts* v. *State*, 376 S.E.2d 851 (Ga. 1989); *People* v. *Crowder*, 515 N.E.2d 783 (Ill. App. 1987); *Hannan* v. *Commonwealth*, 774 S.W.2d 462 (Ky. App. 1989); *State* v. *Adams*, 533 So.2d 1060 (La. App. 1988); *State* v. *Clay*, 779 S.W.2d 673 (Mo. App. 1989); *State* v. *Culver*, 444 N.W.2d 662 (Neb. 1989); *State* v. *Oliviera*, 534 A.2d 867 (R.I. 1987). *Batson* has been extended to encompass gender in *Tyler* v. *State*, 623 A.2d 648 (Md. 1993); *State* v. *Gonzales*, 808 P.2d 40 (1991); *People* v. *Irizarry*, 560 N.Y.S. 279 (A.D. 1 Dept. 1990); *City of Mandan* v. *Fern*, 501 N.W.2d 739 (N.D. 1993); *State* v. *Burch*, 830 P.2d 357 (Wash. App. 1992). The decisions in *Tyler* and *Gonzales* were based, respectively, on the Maryland and New Mexico state constitutions.

reach the *Batson*-gender question because the presence of five women on the jury demonstrated that the use of strikes to keep additional women from being seated was not obvious error. The same approach prevailed in *Mowbray* v. *State*, 788 S.W.2d 658 (Tex. App. 1990), where eight of twelve seated jurors were women. In *State* v. *Clay*, 779 S.W.2d 673 (Mo. App. 1989), the appellate court, in rebuffing the *Batson*-gender argument, noted that five women served on the jury that convicted the appellant. The parallels that may be drawn with the present situation are obvious.

■ At this point in the development of the *Batson* doctrine, we consider it unsound to extend the principle to peremptory challenges based on gender, and we so hold.

The petition for rehearing is denied.